UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA, )<br>)<br>        Plaintiff, )<br>)<br>vs. )<br>)<br>(1) TIGER HOBIA, as Town King )<br>and member of the Kialegee Tribal )<br>Town Business Committee, et al.; )<br>)<br>        Defendants. ) | Case No. 12 CV 054-GKF-TLW |

## DEFENDANTS' COURT REQUESTED BRIEF ON *UNITED KEETOOWAH DECISION* AND THE ISSUE OF "SHARED JURISDICTION"

Joseph R. Farris, OBA #7368
Paula J. Quillin, OBA #2835
FELDMAN, FRANDEN, WOODARD & FARRIS
Williams Center Tower II
2 West 2nd Street, Suite 900
Tulsa, Oklahoma 74103
Tel:  918/583-7129
Fax:  918/584-2814
     and
Dennis J. Whittlesey, OBA #009578
DICKINSON WRIGHT PLLC
1875 Eye Street, NW – Suite 1200
Washington, D.C. 20006
Tel:  202/659-6928

ATTORNEYS FOR DEFENDANTS
TIGER HOBIA, FLORENCE DEVELOPMENT
PARTNERS, LLC and KIALEGEE TRIBAL
TOWN, a federally chartered corporation

May 18, 2012

# DEFENDANTS' COURT REQUESTED BRIEF ON *UNITED KEETOOWAH* DECISION AND THE ISSUE OF "SHARED JURISDICTION"

I. **Defendants Believe the Decision Is Relevant for the Facts of Tribes Sharing Jurisdiction Over Common Land.**

The Court has requested the Parties to brief the question of why it should consider the decision rendered by Assistant Secretary for Indian Affairs Larry Echo Hawk introduced as Defendants' Exhibit 10 during the hearing of May 17. *See United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs.*

Defendants believe the relevance is in the specific report identified at pp 7-8 of the Eastern Regional Director dated April 12, 2009, identifying a number of Oklahoma tribes sharing jurisdiction over common lands. The report is stating the facts of Oklahoma tribes sharing jurisdiction over common land, contradicting the Plaintiff's argument throughout this case that there cannot be shared jurisdiction. The factual recitation was not part of the Echo Hawk decision, as such. It was credibly reporting the shared jurisdiction of specific tribes within the State of Oklahoma.

II. **THE KIALEGEE TRIBAL TOWN HAS SHARED JURISDICTION OVER THE TYLER BURGESS ALLOTMENT WITH THE MUSCOGEE CREEK NATION.**

   A. **The Kialegee Tribe Has Jurisdiction Over the Tyler Burgess Allotment As a Matter of Federal Law.**

To establish that restricted fee land can never be eligible for gaming, the State must prove that the Kialegee Tribe has never had jurisdiction over the land. In this case, the Kialegee Tribe has jurisdiction over the Tyler Burgess Allotment pursuant to the "shared jurisdiction" provision at Article 4 of the 1833 Treaty.

It is not disputed that there are four federally-recognized Creek Indian tribes that are descended from the historic Creek Confederacy, each of which is currently located within the boundaries of the former Creek Reservation. Each was organized and recognized pursuant to the provisions of the OIWA, and the following was established as fact during the hearing:

- **1936**: Congress passed the OIWA, Section 3 of which provided tribes with the ability to acquire land, adopt constitutions and tribal charters and essentially rejuvenate tribal governments. *See* 25 U.S.C. § 503.

- **1938**: The Thlopthlocco Tribal Town organizes pursuant to the OIWA and adopts a tribal constitution and corporate charter.

- **1939**: The Alabama-Quassarte Tribal Town organizes pursuant to the OIWA and adopts a tribal constitution and corporate charter.

- **1941**: The Kialegee Tribal Town organizes pursuant to the OIWA and adopts a tribal constitution and corporate charter.

- **1979**: The Muscogee (Creek) Nation organizes pursuant to the OIWA and adopts a tribal constitution.

The State's expert witness testified and reported that as late as 1937, the acclaimed ethnographer and cultural anthropologist Morris E. Opler explained the nature of the Creek political structure:

> It is essential to realize that the Creeks were not and, strictly speaking, are not now, a tribe. The Creek Nation is a confederacy of tribes, and as a political phenomenon this confederacy stands as the most important and advanced of its kind in aboriginal America with the possible exception of the Iroquois Confederacy.

*See* Morris E. Opler, Report on the History and Contemporary State of Aspects of Creek Social Organization and Government (1937).

Opler's findings were accepted in *Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978), wherein the Court discussed, at great length, the history of the Creek Nation. Indeed, the *Harjo* court discussed the Creek Nation's political subdivision into tribal towns:

2

> [t]he Creek Nation, historically and traditionally, is actually a confederacy of autonomous tribal towns, or *talwa*, each with its own political organization and leadership. Membership in a town is a matter of birthright rather than residence, each Creek being, by birth, a member of his mother's town, or, if his mother is non-Indian, a member of his father's town. Originally, there were four "mother" towns, but the number was expanded by a transfer of town fires, until, by the time of the adoption of the [Nation's] 1867 Constitution, there were approximately [44] *talwa* in existence. . . .

*Id.* at 951 n. 7.

With this unique history as context, the Creeks historically occupied lands in the Southeastern United States. However, they were required to vacate their homes and relocate to lands west of the Mississippi River as a result of President Andrew Jackson's Indian Removal Act of May 8, 1830 (21st Cong., 1st Sess.), a removal already identified and well-known as the infamous "Trail of Tears." Each of the removed tribes was to be relocated to lands reserved for them by executed treaty, which for the Creeks was the 1833 Treaty. The critical provision with regard to this litigation was Article 4, which specifically identified the lands reserved for Creeks as their permanent reservation:

> **ART. IV.** It is hereby mutually understood and agreed between the parties to this treaty, that the land assigned to the Muskogee [or Creek] Indians, by the second article thereof, *shall be taken and considered the property of the whole Muskogee or Creek nation*, as well as those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi *** [Emphasis supplied.]

Article 2 of the 1833 Treaty contains a detailed metes and bounds description of the land that became the Creek Reservation (now former Creek Reservation) in Eastern Oklahoma. The 1833 Treaty pointedly reserved the reservation for all of the Creek Indians. Nothing in that Treaty -- or any other Creek Treaty -- even suggested that any individual Creek Indian or tribal town would have less than a shared and common ownership in the whole reservation (along with all other removed Creeks and tribal towns).

3

The Indian Canon of Construction and the Doctrine of Originalism are stipulated to in this matter, and courts must apply them when considering provisions of treaties. Accordingly, this Court must "give effect to the terms *as the Indians themselves would have understood them*" at the time of negotiation and signing. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S. Ct. 1187, 183 L. Ed. 2d 270 (1999) (citing, *inter alia*, *United States v. Winans*, 198 U.S. 371, 380, 25 S. Ct. 662, 49 L. Ed. 1089 (1905)) (emphasis supplied); *Absentee Shawnee Tribe of Indians v. Kansas*, 862 F. 2d 1415, 1418 (10th Cir. 1988).

The State's expert witness, Dr. Gary Anderson, testified on cross examination that he agreed with Defendants that at the time of the Treaty of 1833, the Creeks understood all property rights and jurisdiction to have been "communal." Thus, that Creek understanding of their then-current property rights must be accepted by this Court in determining what the Creeks understood would be their ownership and jurisdictional interests in the reservation being formally established by that Treaty -- which was communal ownership.

**B.     Shared Jurisdiction Is Found Not Just in Oklahoma, but in Other States.**

A 1984 Ninth Circuit decision confirmed that multiple tribes can share treaty-reserved jurisdiction at a single reservation. *Leo Williams v. William P. Clark, Secretary of the Interior, et al.*, 742 F.2d 549 (9th Cir. 1984). In concluding that the Quileute Tribe has treaty rights and jurisdiction over lands within the Quinault Reservation that cannot be abrogated by unilateral actions of the Quinault Tribe and Interior Secretary acceptance thereof, the Ninth Circuit stated:

> <u>Congress may abrogate rights reserved to Indian tribes in treaties.</u> To abrogate treaty rights, however, <u>Congress must clearly and unequivocally express its intent to do so</u>. *State of Idaho v. Andrus*, 720 F.2d 1461, 1464 (9th Cir. 1983).

\* \* \*

4

> <u>The Quileute Tribe's failure to state expressly in its constitution that the Quinault Reservation is part of its territory does not extinguish the tribe's property rights in the reservation. Treaty rights may be extinguished only in rare circumstances. Laches or estoppel may not defeat treaty rights.</u> *Swim v. Bergland,* 696 F.2d 712, 718 (9th Cir. 1983). Additionally, the Supreme Court has implied that a tribe may not unilaterally relinquish jurisdiction absent explicit congressional authorization and strict compliance with statutory requirements. *See Kennerly v. District Court,* 400 U.S. 423, 426-29, 27 L.Ed. 2d 507, 91 S.Ct. 480 (1971).

742 F.2d at 553, 554. [Emphasis supplied.]

The Ninth Circuit ruling was the direct product of the decision in *Halbert v. United States,* 283 U.S. 753 (1931), interpreting the rights of the Quileute Indian Tribe of Washington within the boundaries of the Quinault Reservation, home of the Quinault Indian Tribe of Washington. While the Quileute Tribe occupied a separate reservation, it and Quinault were among eight tribal signatories to the Treaty of Olympia of July 1, 1855, and January 25, 1856 (12 Stat. 971). The Supreme Court ruled that the Quinault Reservation had been established for all of them and members of each of the eight tribes[1] had treaty rights at the reservation in common with the other signatory tribes.

As noted above, a number of Oklahoma tribes also share jurisdiction with others.

Defendants were prepared to present rebuttal expert testimony from a witness who is widely recognized as one of the nation's leading experts on the Ethnohistory of the American Indian and has testified countless times in that capacity, including as a witness for both tribes and (federal and state) government agencies. However, Defendants' expert witness was unecessary in light of the State's expert conceding that the Creek ownership of all Creek lands was "communal." That concession eliminated the need for dueling experts, for both experts now

---

[1] The signatory tribes were Quinault, Quileute, Chehalis, Chinook, Cowlitz, Quit, Hoh and Ozette.

agree that the Indians understood that their new Oklahoma reservation set aside by the 1833 Treaty was being "taken and considered the [communal] property of the whole Muscogee or Creek Nation...."

There is no evidence of any Congressional abrogation of the Creeks' treaty guaranteed communal ownership of what became the Creek Reservation in Eastern Oklahoma.

And there is no evidence that any rights of the Kialegee Tribal Town are inferior or subordinate to the rights of the Muscogee Tribal Town.[2]

                        Respectfully submitted,

                        FELDMAN, FRANDEN, WOODARD & FARRIS

                        /s/ Paula J. Quillin
                        Joseph R. Farris, OBA #2835
                        Paula J. Quillin, OBA #7368
                        Williams Center Tower II, Suite 900
                        2 West 2nd Street
                        Tulsa, Oklahoma 74103
                        Tel:   918/583-7129
                        Fax:  918/584-3814
                                and
                        Dennis J. Whittlesey, OBA #009578
                        DICKINSON WRIGHT PLLC
                        1875 Eye Street, NW – Suite 1200
                        Washington, D.C. 20006
                        Tel:   202/659-6928

---

[2] Kialegee is one of the three federally-recognized tribal towns comprised of Creek Indians with virtually identical histories, as was confirmed by the Interior Board of Indian Appeals. *Kialegee Tribal Town v. Muscogee Area Director, Bureau of Indian Affairs*, 19 IBIA 296, 297 (April 17, 1991). The Plaintiff apparently believes that this decision confirms that none of the Tribal Towns has any jurisdiction over reservation lands regardless of any provision of treaty law since the Secretary determined that the Muscogee Creek Nation was the governing body of the Creek Reservation, an administrative policy decision overriding the treaty-reserved communal property rights of the Kialegee Tribal Town. To the extent the IBIA decision can be read for the principle argued by Plaintiff, the principle was voided as of May 31, 1994, when Congress amended the pertinent law, 25 U.S.C. § 476, by adding two new subsections 476(f) and (g). With this amendment, Congress eliminated any notion, let alone prior rulings, that federal administrative actions can in any way diminish treaty-reserved privileges and immunities of any recognized tribe.

ATTORNEYS FOR DEFENDANTS
TIGER HOBIA, FLORENCE
DEVELOPMENT PARTNERS, LLC and
KIALEGEE TRIBAL TOWN, a federally
chartered corporation

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of May, 2012, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

M. Daniel Weitman
dan.weitman@oag.ok.gov

Lynn H. Slade
lynn.slade@modrall.com

William C. Scott
bscott@modrall.com

R. Tom Hillis
thillis@titushillis.com

Jared B. Cawley
Jared_cawley@hotmail.com

/s/ Paula J. Quillin