**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12 cv-00054-GFK-TLW |
| | ) | |
| (1) TIGER HOBIA, as Town King | ) | |
| and member of the Kialegee Tribal | ) | |
| Town Business Committee; et al. | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF OKLAHOMA'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, the State of Oklahoma ("State" or "Oklahoma"), hereby submits its

Proposed Findings of Fact and Conclusions of Law with respect to the matters tried at the

hearing on the State's Motion for Preliminary Injunction [Doc. 4, 6] on May 16-18, 2012.

**PROPOSED FINDINGS OF FACT**

The Parties

1.  The State is a State of the United States of America possessing the sovereign

powers and rights of a State.

2.  Kialegee Tribal Town ("Tribal Town") is a federally recognized Indian tribe,

organized under Section 3 of the Oklahoma Indian Welfare Act, 25 U.S.C. § 503

("OIWA"), with a Constitution and By-laws approved by the Secretary of the Interior

("Secretary") on April 14, 1941, and ratified by the Tribal Town on June 12, 1941 ("1941

Constitution"). The 1941 Constitution established the Kialegee Tribal Town Business

Committee ("Committee") as the Tribal Town's governing body. Answer by Tiger

Hobia, Florence Development Partners, LLC, and Kialegee Tribal Town, a federally

Chartered Corporation (May 10, 2012) [Doc. 114], ¶ 7 ("Defendants' Answer");
Plaintiff's Exhibit 2 (Kialegee Tribal Town Constitution).

3.   Kialegee Tribal Town, a federally chartered corporation ("Town Corporation"), is
a corporation with a federal charter issued under Section 3 of the OIWA, approved by the
Secretary of the Interior on July 23, 1942, and ratified by the Tribal Town on September
17, 1942 ("Charter").   Defendants' Answer, ¶¶ 10, 21; Defendants' Ex. 2 (Kialegee
Tribal Town Corporate Charter).

4.   Defendant Tiger Hobia is the Town King, or "Mekko," of the Tribal Town, is a
member of the Committee, and is a citizen and resident of the State of Oklahoma.
Defendant Hobia is also the King, or Mekko, of the Town Corporation.   Defendants'
Answer, ¶ 8.

5.   Florence Development Partners, LLC is an Oklahoma limited liability company
doing business in the State of Oklahoma.   Defendants' Answer, ¶ 9.

<u>The Kialegee Tribal Town</u>

6.   The Tribal Town is headquartered in Wetumka, Oklahoma.   Defendants' Answer,
¶ 18; Plaintiff's Exhibit 2, Bylaws Art. II.

7.   The members of the Tribal Town historically have been concentrated in a 15
square mile area around Wetumka, Oklahoma, near the confluence of Hughes, McIntosh,
and Okfuskee Counties, Oklahoma. Plaintiff's Exhibit 21 (Report Regarding the
Historical Relationship of the Muscogee (Creek) Nation with the Kialegee Tribal Town,
by Gary Clayton Anderson), at 28; Testimony of Gary C. Anderson (May 16, 2012)
[Doc. 130] ("Anderson testimony"), p. 111, ln. 19-23.

8.   The Tribal Town does not have a reservation.  Plaintiff's Exhibit 21, at 44-45.

9.   The Tribal Town's 1941 Constitution does not define any geographic or territorial jurisdiction for the Tribal Town.  Plaintiff's Exhibit 2.

10. Article IV, Section 1 of the Tribal Town's 1941 Constitution provides that the "supreme governing body of the Town shall be the adult members of the Town, both male and female who are 21 years of age or older, through the actions of the Business Committee."  *Id.*

11. Under Article V of the 1941 Constitution, the officers of the Tribal Town are "the Town King, 1st Warrior, 2nd Warrior, Secretary and the Treasurer."  Article VI, Section 2 of the 1941 Constitution provides that the elected officers shall "select and appoint five members to serve as an Advisory Committee. . . ."  *Id.*

12. Article IV of the 1941 Constitution provides that the powers of the Tribal Town are set forth in the Charter of the Town Corporation.  *Id.*  In its Resolutions authorizing actions of the Tribal Town related to the gaming venture, the Tribal Town repeatedly referenced the Charter of the Town Corporation as providing powers exercised in the gaming activities.  Plaintiffs' Exhibits 6, p. 1, 12 (Ex. D, p.1).

13.  Section 2 of the Charter for the Town Corporation declares that "the membership, the officers, and the management of the incorporated tribal town shall be as provided in the . . . Constitution and By-laws."  Defendants' Exhibit 2.

14. Section 3(b) of the  Charter provides that, "subject to any restrictions contained in the Constitution and laws of the United States or in the Constitution and By-laws of the Tribal Town, and to the limitations of section 4 and 5 of this Charter," the Town Corporation

> shall have the following corporate powers as provided by section 3 of the Oklahoma Indian Welfare Act of June 26, 1936: . . . (b) To sue and be

sued; to complain and defend in any courts; Provided, however, That the grant or exercise of such power shall not be deemed a consent by the Tribal Town or by the United States to the levy of any judgment, lien, or attachment upon the property of the Tribal Town other than income or chattels specially pledged or assigned.

*Id.*

15. In 2004, Oklahoma established a model tribal gaming compact that is essentially a "pre-approved" offer to federally recognized tribes in the State ("Model Compact"). 3A Okl. St. Ann. §§ 280-81. If a tribe accepts the Model Compact, obtains approval of the Compact by the Secretary of the Interior, and complies with the requirements of the Compact and the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 – 2721 ("IGRA"), the tribe can operate Class III gaming facilities on "its Indian lands," Model Compact, Part 5(L).

16. On April 12, 2011, the Tribal Town accepted the Model Compact with the State of Oklahoma (the "Kialegee-State Gaming Compact"). Plaintiff's Exhibit 1A (Affidavit of Campbell with Kialegee-State Gaming Compact attached).

17. The Secretary of the Interior approved the Kialegee-State Gaming Compact on July 8, 2011. *Id.*

18. The Kialegee-State Gaming Compact only authorizes the Tribal Town to operate "covered games," as defined in the Compact, on "its Indian lands as defined by the Indian Gaming Regulatory Act, 25 U.S.C., Section 2703(4)." *Id.*, Part 5(L).

<u>The Creek Nation</u>

19. In the 1500s, the Creek Nation inhabited portions of what are today the States of Alabama and Georgia. The Creek villages were disbursed throughout that area. Plaintiff's Exhibit 21, at 2-3.

20. During the 1700s, the Creek Nation began to coalesce into two main groups of villages known as the Upper Towns and the Lower Towns.  By the late 1700s, the villages, or towns, within the Creek Nation had given up some political and governmental power to the two largest villages, Tuckabache and Coweta.  Plaintiff's Exhibit 21, at 3-6; Anderson testimony, p. 54, ln. 14-25;

21. By the early 1800s the Creek Nation had further consolidated political and governmental power in a Creek National Council.  Plaintiff's Exhibit 21, at 6-7; Anderson testimony, p. 55, ln. 10 – 21; p. 57, ln. 21 – p. 58, ln. 17.

22. In the 1830s, the Creek Nation was removed from the southeastern United States to land in what is now Oklahoma. Plaintiff's Exhibit 21, at 9; Anderson testimony, p. 58, ln. 22 – p. 59 ln. 6.

23. Pursuant to the Treaty of March 24, 1832, 7 Stat. 366, the United States granted the Creek Nation certain land in Oklahoma in fee simple.  Plaintiff's Exhibit 22 (Treaty of March 24, 1832); Anderson testimony, p. 74, ln. 17 – p. 78, ln. 12.

24. On August 7, 1856, the United States and the Creek Nation entered into a further Treaty, 11 Stat. 699, in which the United States specifically recognized the existence of the Creek National Council and the power of that Council to make laws.  Plaintiff's Exhibits 21, at 11-12; Plaintiff's Exhibit 23 (Treaty of August 7, 1856); Anderson testimony, p. 81, ln. 3 – p. 83, ln. 21.

25. In the Treaty of June 14, 1866, 14 Stat. 785, the United States required the Creek Nation to cede the western portion of the Creek Nation's treaty lands in Oklahoma as a penalty for the Creek Nation's alliance with the Confederacy during the Civil War. That Treaty reaffirmed the Creek Nation's title to the remaining portion of the 1832 Treaty

Territory (which included all or portions of what are today the Oklahoma counties of Creek, Tulsa, Wagoner, Okfuskee, Okmulgee, Muskogee, McIntosh, and Hughes) and the Creek Nation's right to self-government.   Plaintiff's Exhibits 21, at 12-13; Plaintiff's Exhibit 24 (Treaty of June 14, 1866); Anderson testimony, p. 84, ln. 21 – p. 85, ln. 17.

26. In 1867, the Creek Nation adopted a written constitution which provided for separation of powers into executive, legislative and judicial branches.  Legislative power was lodged in the Creek National Council, a bi-cameral body in which each tribal town was entitled to one delegate in the House of Kings, and one in the House of Warriors, plus an additional delegate in the House of Warriors for every two hundred people. Plaintiff's Exhibit 21, at 13; Anderson testimony, p. 61, ln. 15 – p. 62, ln. 12.

27. In 1887, Congress passed the General Allotment Act, 24 Stat. 388, which provided for the allotment of tribal lands to individual tribal members.  The Creek Nation, as well as certain other Oklahoma tribes, were excluded from the General Allotment Act because of treaty provisions and because those tribes held land in fee simple.  Anderson testimony, p. 62, ln. 16 – ln. 20.

28. In 1893, Congress created the Dawes Commission and empowered it to negotiate allotment agreements with the Creek Nation, among other tribes.  Subsequently, in 1898, Congress passed the Curtis Act which provided for forced allotment of Creek Nation tribal lands.  Plaintiff's Exhibit 21, at 16-17; Anderson testimony, p. 62, ln. 18 – p. 63, ln. 14.

29. On March 8, 1900, the Creek Nation and the United States entered into an agreement governing the allotment of the Creek Nation's lands.  31 Stat. 861.  Under that agreement, the Principal Chief of the Creek Nation was to execute and deliver to each

enrolled member of the Creek Nation an allotment deed conveying "all right, title, and interest of the Creek Nation" in the property being allotted to each such enrolled member. Plaintiff's Exhibits 21, at 17-18; Plaintiff's Exhibit 25 (Agreement of March 8, 1900); Anderson testimony, p. 90, ln 1 – p. 93, ln. 25.

30.   As part of the allotment of those lands, on August 6, 1903, an allotment deed and a homestead patent were issued to Tyler Burgess, a full-blooded enrolled Creek member, for a total of 160 acres of land  in what is today Broken Arrow, Tulsa County, Oklahoma. Plaintiff's Exhibits 12 (Petition for Approval of Prime Ground Lease and Supporting Exhibits), 13 (Order Approving Final Account, Distribution, and Discharge and Confirming Heirship), 14-15 (Answers of Giles and Capps in *Oklahoma Turnpike Authority v. 5.69 Acres of Land*).

31. Tyler Burgess was not a member of the Kialegee Tribal Town.   Statement of Defendants' counsel (May 17, 2012) [Doc. 131], p. 31, lns. 17 - 20.

32. In 1936, Congress passed the Oklahoma Indian Welfare Act, Act of June 26, 1936, 49 Stat. 1967, 25 U.S.C. § 503, which authorized Indian tribes in Oklahoma to re-organize, develop constitutional governments, and obtain corporate charters.

33. In 1979, the Muscogee (Creek) Nation, pursuant to the OIWA, adopted a new constitution providing for three separate branches of government. That Constitution declares, among other things, that "the political jurisdiction of The Muscogee (Creek) Nation shall be as it geographically appeared in 1900 which is based upon those Treaties entered into by the Muscogee (Creek) Nation and the United States of America. . . ." The Muscogee (Creek) Nation Constitution was approved by the Secretary of the Interior on August 17, 1979.  Plaintiff's Exhibit 3 (Muscogee (Creek) Nation Constitution).

34. In 2002, the Muscogee (Creek) Nation adopted a Gaming Code, enacted as Chapter 21 of the Muscogee (Creek) Nation Code.  That Code requires any person conducting or seeking to conduct a gaming operation within the Muscogee (Creek) Nation to have a valid and current permit from the Gaming Commissioner of the Muscogee (Creek) Nation.

<u>The Proposed Casino and Surrounding Area</u>

35. The Defendants currently are constructing and intend to immediately operate the "Red Clay Casino," a gaming facility which will offer Class II and Class III gaming, on property located at the southwest corner of Olive Avenue (South 129th East Avenue) and Florence Street (South 111th Street East), in Broken Arrow, Oklahoma (the "Broken Arrow Property"). The Broken Arrow Property contains approximately 30 acres and is described as follows:

> The East 1245.3 feet of the North 1245.3 feet of the Northeast quarter of Section Thirty Two (32), Township Eighteen (18) North, Range Fourteen (14) East of the Indian Base and Meridian, Tulsa County, State of Oklahoma, less and  except one acre reserve as life Estate for Willis G. Burgess:
>
> LESS AND EXCEPT
>
> A STRIP, PIECE OR PARCEL OF LAND LYING IN PART OF THE Northeast Quarter (NE1/4) of Section 32, Township 18 North, Range 14 East of the Indian Base and Meridian, Tulsa County, Oklahoma.  Said parcel of land being described as follows:
>
> Beginning 726.22 feet south of the Northeast corner of said NE 1/4; THENCE South 01°13'28" East along the East Line of said NE ¼ a distance of 519.08 feet; THENCE South 88°38'08" West a distance of 65.00 feet; THENCE North 02°37'56" East a distance of 520.42 feet; THENCE North 88°46'32" East a distance of 30.00 feet to the POINT OF BEGINNING, containing 24,660 square feet or 0.57 acres, more or less.
>
> AND

Beginning 793.14 feet West of the Northeast corner of said NE ¼; THENCE South 01°22'07" East a distance of 30.00 feet; THENCE South 01°23'59" East a distance 20.00 feet; THENCE South 85°29'21" West a distance of 453.05 feet; THENCE North 01°13'22" West a distance of 74.75 feet to a point on the North line of said NE ¼; THENCE North 88°37'08" East along the North line of said NE ¼ a distance of 452.16 feet to the POINT OF BEGINNING. Containing 28,211 square feet or 0.65 acres, more or less.

AND

Commencing at the Northeast corner of said NE ¼; THENCE South 01°13'28" East along the East line of said NE ¼ a distance of 1245.30 feet; THENCE South 88°37'05" West a distance of 440.04 feet to the POINT OF BEGINNING, THENCE continuing South 88°37'05" West a distance of 805.26 feet; THENCE North 01°13'28" West a distance of 423.92 feet; THENCE Southeasterly on the arc of a curve to the left, said curve having a radius of 2101.83 feet (said curve being sub-tended by a chord bearing South 51°32'54" East, and a chord length of 224.89 feet), an arc distance of 225.00 feet; THENCE South 60°18'28" East a distance of 455.51 feet; THENCE South 80°52'21" East a distance of 245.38 feet to the POINT OF BEGINNING. Containing 129,289 square feet or 2.97 acres, more or less.

Defendants' Answer, ¶ 31; Plaintiff's Exhibits 6 (Resolution approving Machine Lease and Machine Lease), 7 (Ground Lease Agreement), 8 (First Amendment to Ground Lease), 9 (Memorandum of Lease), 10 (Sept. 20, 2011 letter from Tracie L. Stevens to Hobia), 11 (April 26, 2012 letter from Paxton Myers to Hobia), 16 (Joint Venture Operating Agreement), 17 (Amended and Restated Joint Venture Operating Agreement), 18 (May 6, 2012 letter from Hobia to Paxton Myers). The Broken Arrow Property is located within an area that was granted to the Creek Nation in the 1832 Treaty. Anderson testimony, p. 142, ln. 9 – 13.

36. The Broken Arrow Property is a portion of the 160 acres of restricted fee land issued to Tyler Burgess, a full-blooded enrolled Creek member, in 1903.   Plaintiff's Exhibits 14, 15; Anderson testimony, p. 214, ln. 3 - 7.

37. The Broken Arrow Property since has passed by descent to two heirs of Tyler Burgess: Wynema L. Capps and Marcella S. Giles, who hold the property as tenants in common, subject to federal restraints against alienation.  Plaintiff's Exhibits 14, 15.

38. As of May 18, 2012, Wynema L. Capps was not an enrolled member of the Tribal Town.   Wynema L. Capps is an enrolled member of the Muscogee (Creek) Nation. Court's Ex. 1 (email listing stipulations agreed to by counsel).

39. As of May 18, 2012, Marcella S. Giles was not an enrolled member of the Tribal Town.  Marcella S. Giles is an enrolled member of the Muscogee (Creek) Nation.  *Id.*

40. The Broken Arrow Property is located more than 70 miles north of the Tribal Town's Headquarters in Wetumka, Oklahoma. Anderson testimony, p. 214, lns. 17 - 23.

41. The Broken Arrow Property is not held in trust by the United States for the benefit of the Tribal Town.  Defendants' Answer, ¶ 38.

42. The Broken Arrow Property is not held in trust by the United States for the benefit of any enrolled member of the Tribal Town.  Defendants' Answer, ¶ 39.

43. The Broken Arrow Property is not held by either the Tribal Town or an enrolled member of the Town subject to restriction by the United States against alienation.

44. The Tribal Town has no property interest in the Broken Arrow Property. Testimony of Luis Figueredo, (May 17, 2012) [Doc. 131], p. 349, lns. 1 - 5.

45. The Broken Arrow Property is located across the street from the Broken Arrow Campus of the Tulsa Technology Center ("Tulsa Tech"), a vocational and technology training school operated by the Tulsa Tech School District No. 18, at 4000 W. Florence, Broken Arrow, Oklahoma.  The Broken Arrow Campus of Tulsa Tech provides full and

part-time secondary and adult education services to roughly 3,500 students.  Plaintiff's Exhibits 33a and 33b (Aerial photo and video).

46. The Broken Arrow Property is in close proximity to several residential subdivisions and several churches, and is roughly one-half mile from the site of a proposed new elementary school and pre-kindergarten center that are scheduled to open in 2013.  The closest church to the Broken Arrow Property, Abiding Harvest United Methodist Church, is located approximately a quarter mile away from the Broken Arrow Property and conducts an addiction recovery program that includes members struggling with gaming addiction. *Id.*; Testimony of Chris Buskirk (May 17, 2012) [Doc. 131], p. 238, ln. 12-13, p. 241, ln. 5 - 18.

<u>The Tribal Towns' On-going Efforts to Establish the Red Clay Casino</u>

47. In 2011, the Tribal Town, as Tenant, executed a Prime Ground Lease with Wynema L. Capps and Marcella S. Giles, Landlord, for the Broken Arrow Property as a site for a proposed Class III gaming facility. Plaintiff's Exhibits 7, 8, 9.

48. Wynema L. Capps and Marcella S. Giles filed a petition in the Oklahoma State District Court for Tulsa County pursuant to the Act of August 4, 1947, 61 Stat. 731 (the "1947 Act"), seeking approval of the proposed Prime Ground Lease.  The 1947 Act declares, in relevant part, that "no conveyance, including an oil and gas or mineral lease, of any interest in land acquired before or after the date of this Act by an Indian heir or devisee of one-half or more Indian blood when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated. . . ."  Plaintiff's Exhibit 12.

49. The Tribal Town contemplated that, once the Prime Ground Lease was approved, the Tribal Town would sublease the Broken Arrow Property to Golden Canyon Partners, LLC, which would then construct the proposed casino and would, in turn, sublease the casino to the Tribal Town to operate. *Id.*; Plaintiff's Exhibits 7, 8.

50. On August 17, 2011, the Tulsa County District Court entered an Order refusing to approve the proposed Prime Ground Lease and the balance of the transaction contemplated thereby.    Testimony of Figueredo, p. 325, ln. 4.

51. In the meantime, on May 10, 2011, Wynema L. Capps and Marcella S. Giles, as Landlord, entered into a separate Ground Lease Agreement with Defendant Florence Development Partners, LLC, as Tenant, pertaining to the Broken Arrow Property (the "May 2011 Lease").  On approximately December 1, 2011, the May 2011 Lease was amended to add the Tribal Town as a signatory.  A Memorandum of Lease describing the essential terms of the May 2011 Lease, as amended, was recorded in the office of the Tulsa County Clerk on January 3, 2012 as document no. 2012000124.  Plaintiff's Ex. 9; Testimony of Figueredo, p. 325, ln. 20 – 22.

52. Under the May 2011 Lease, Wynema L. Capps and Marcella S. Giles, as Landlord, purported to lease the Broken Arrow Property to Florence Development Partners, LLC, as Tenant, "for a term commencing on the later of May 10, 2011 or the Effective Date (as defined in the Lease) and shall expire on April 1, 2017. . . ."  The May 2011 Lease further purports to grant Defendant Florence Development Partners, LLC, as Tenant, "the right, privilege, and option to extend the Term of the Lease for four (4) periods of ten (10) years each, upon and subject to the terms and conditions contained in

the Lease."  The ultimate duration of the May 2011 Lease thus could exceed 46 years. Plaintiff's Ex. 7, p. 2, Plaintiff's Ex. 8, 9, admitted, Transcript p. 259.

53. The May 2011 Lease has not been reviewed or approved by the Oklahoma State District Court for Tulsa County, Oklahoma, pursuant to the 1947 Act.  Testimony of Figueredo, p. 325, ln. 20 – 22, p. 328, ln. 17 – 23.

54.  The May 2011 Lease has not been reviewed or approved by the Secretary of the Interior or his designee pursuant to 25 U.S.C. § 415 and 25 C.F.R. §162.104(d).  25 U.S.C. § 415 mandates that "[a]ny restricted Indian lands, whether tribally or individually owned" may only be leased "with the approval of the Secretary of the Interior."  That section further dictates that prior to approval of any lease, "the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; [and] the availability of police and fire protection and other services" among other factors.  *Id.* However, the May 2011 Lease, as amended, has not been formally terminated by the parties to that Lease, and Defendant Florence Development Partners, LLC could still present the Lease to the Secretary for approval.  Testimony of Figueredo, p. 329, ln. 15 – 20.

55. In late December 2011, Defendants initiated (or caused the initiation of) significant grading and other site preparation and construction-related activities leading to the construction and ultimate operation of the Red Clay Casino on the Broken Arrow Property.  That work is now proceeding at a rapid pace, with portable buildings and other

structures being installed on the property.  Testimony of Figueredo, p. 303, ln. 23 – p. 304, ln. 17.

56. On April 11, 2011, Golden Canyon Partners, LLC, Marcella S. Giles, Wynema L. Capps, and the Kialegee Tribal Town, a federally recognized tribe, entered into the Operating Agreement of Florence Development Partners, LLC.   That Operating Agreement was the original operating agreement for a joint venture which was to operate the Red Clay Casino.  Testimony of Figueredo, p. 329, lns 21 – 25; p. 330, lns. 1 – 13; Plaintiff's Exhibit 16.

57. On May 1, 2012, an Amended and Restated Joint Venture Operating Agreement of Florence Development Partners, LLC was executed.   That Amended and Restated Joint Venture Operating Agreement is the current agreement governing the entity that would construct and operate the Red Clay Casino.  Testimony of Figueredo, p. 331, lns. 3 – 25; p. 332, lns. 1 – 4.

<u>Impact of the Proposed Casino on the Surrounding Community</u>

58. The Abiding Harvest United Methodist Church, which is located less than one-quarter mile from the Broken Arrow Property, operates an addiction recovery program, which specifically addresses gaming addiction.  The presence of a casino on the Broken Arrow Property, in close proximity to the gaming addiction recovery program at the Abiding Harvest Church, would be counterproductive and will be detrimental to the participants in the addiction recovery program.  Testimony of Buskirk, p. 242, ln. 15 – 25.

59. Most governmental services in the area of the Broken Arrow Property are provided by the City of Broken Arrow.  The City of Broken Arrow Police and the Tulsa

County Sheriff provide law enforcement in the area.  The City of Broken Arrow Fire Department provides fire and emergency medical services.  The City of Broken Arrow provides water and sanitary sewer services to the area.  Educational services in the area of the Broken Arrow Property are provided by the Broken Arrow Municipal School District. The Tribal Town does not provide any services to the Broken Arrow Property. Testimony of John Bowman (May 17, 2012) [Doc. 131], p. 221, ln. 23 – 25; Testimony of Norm Stephens (May 17, 2012) [Doc. 131], p. 232, ln. 1 – 16.

60. The Tribal Town does not have a police force, fire department, or emergency medical service providers.  Court's Ex. 1.

61. The Tribal Town does not have a court or a jail.  *Id.*; Testimony of Luis Figueredo (May 17, 2012), p. 346, lns. 10 - 16.

62. The Tribal Town does not provide educational, sanitary sewer, or other governmental services in the area of the Broken Arrow Property.  Testimony of Norm Stephens, p. 232, ln. 1 – 16; Testimony of Luis Figueredo (May 17, 2012), p. 348, ln. 15 – 25.

63. The Tribal Town does not provide education, job training, public safety, social services, or other similar services to the Broken Arrow Property or persons or property in the vicinity of the Broken Arrow Property.  There are no Tribal Town members who live on or in close proximity to the Broken Arrow Property.  Testimony of Stephens, p. 232, ln. 1 – 16; Testimony of Luis Figueredo (May 17, 2012), p. 315, ln. 3 – 20, p. 349, ln. 18 – 21.

64. Any law enforcement, fire, or emergency services for the Broken Arrow Property are provided by the City of Broken Arrow, the County of Tulsa, the State of Oklahoma,

or the Muscogee (Creek) Nation per a cross-deputization agreement between the Muscogee (Creek) Nation and other governments.   Plaintiff's Exhibit 32 (Cross-Deputization Agreement); Testimony of Stephens, p. 233, ln. 9 – p. 234, ln. 15.

65. The Tribal Town does not have a cross-deputization agreement pursuant to which law enforcement services might be provided with Broken Arrow or any other government that exercises jurisdiction in the area covering, or in the vicinity of, the Broken Arrow Property.  Court's Ex. 1; Testimony of Stephens, p. 233, ln. 21 – 23.

66. The Tribal Town has not made any concrete manifestations of government authority with regard to the Broken Arrow Property.

67. The Broken Arrow City Council, local neighborhood associations and local churches have all expressed their opposition to the construction and operation of the Red Clay Casino.   More than 10,000 area residents have signed a petition declaring their opposition to the construction and operation of the Red Clay Casino on the Broken Arrow Property.  Plaintiff's Exhibit 34 (Petition); Testimony of Martinek, p. 252, ln. 2 – 15.

68. The public has an interest in having the state and federal gaming laws and compacts enforced.

69. The public interest would not be harmed by the entry of a preliminary injunction barring the continued construction and operation of the proposed Red Clay Casino because there are ample alternative venues available to the gaming public in the greater Tulsa metropolitan area.

### PROPOSED CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 25 U.S.C. § 2710(d)(7).

2.   This Court has jurisdiction over the parties to this action.

3.   Any sovereign immunity of the Tribal Town or the Town Corporation is not a defense to this suit because (i) the action is against Tiger Hobia, Town King ("Mekko") of the Tribal Town and the Corporation, and the officers and Committee members of such entities sued in their official capacities, *see Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011), (ii) no immunity is available to the Tribal Town as the IGRA abrogated its immunity from suit, *see Mescalaro Apache Tribe v. New Mexico*, 131 F.3d 1379, 1385 (10th Cir. 1997), and (iii) Article 3(b) of the 1942 Charter of the Town Corporation, which the 1941 Constitution states also defines the powers of the Tribal Town, provides that the Town Corporation has the power "to sue and be sued," *see Native Am. Distrib. v. Senaca-Cayuga Tobacco Co.*, 491 F. Supp. 2d 1056, 1065 (N.D. Okla. 2007), *aff'd* 546 F.3d 1288 (10th Cir. 2008); Opinion and Order [Doc. 105], at 16.

4.   Venue is proper under 28 U.S.C. § 1391(b) because the Broken Arrow Property is located within this District and a substantial part of the events giving rise to the claims in this case have occurred or are occurring in this District.

5.   Exhaustion of tribal remedies is neither necessary nor appropriate with respect to the claims presented because the Tribal Town does not have a Tribal Court, and the IGRA specifically grants the federal district courts jurisdiction over this action.  *See* 25 U.S.C. § 2710(d)(7).

6.   The purpose of a preliminary injunction is to preserve the status quo and "the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

7.  Four factors determine whether a preliminary injunction is warranted: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether "the movant will suffer irreparable harm unless the injunction issues;" (3) whether "the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party;" and (4) whether the public interest will be served by an injunction. *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998).

8.  The requested injunction is not of the type historically disfavored, *see O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (listing the disfavored types as "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits"), but even if it was, the State has satisfied the heavier burden of demonstrating that the four factors favoring a preliminary injunction "weigh heavily and compellingly" in the State's favor, *id.* (quoted authority omitted).

9.  The court must balance the factors to determine whether the equities favor granting a preliminary injunction.  *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246-47 (10th Cir. 2001).

10. The burden of persuasion on a party seeking a preliminary injunction is to establish a substantial likelihood of success on the merits.  *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

11. This burden is significantly lower than the preponderance of the evidence standard the moving party must satisfy at trial on the merits.  *See Gonzales*, 546 U.S. at

428-29. The Tenth Circuit has a liberal definition of "probability of success on the merits:"

> [W]here the moving party has established that the three "harm" factors tip decidedly in its favor, the "probability of success requirement" is somewhat relaxed. In such cases, the movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.

*Heideman*, 348 F.3d at 1189 (internal quotation marks, citations, alterations omitted); *see* 13 *Moore's Federal Practice*, §65.22[j] (Matthew Bender 3d. Ed. 2012) (referring to this as the "'fair-ground-for-litigation' standard").

12. "The Federal Rules of Evidence do not apply strictly to preliminary injunction hearings." *Heideman*, 348 F.3d at 1188; *see Univ. of Texas*, 451 U.S. at 395; *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 753 (10th Cir. 1987) ("Such relief is customarily granted with procedures less formal and evidence less complete than in a trial on the merits. A party is not required to prove his whole case at a TRO or preliminary injunction hearing"). Courts may consider hearsay, *see Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010), and other types of otherwise inadmissible evidence at the preliminary injunction stage, *see Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("Furthermore, at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence . . . ."); *see also Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (stating that requirements for affidavits in support of a motion for summary judgment, under Fed. R. Civ. P. 56(e), do not apply to affidavits filed in support of a preliminary injunction).

13. In 1988, Congress passed the IGRA to establish a statutory basis for the operation and regulation of gaming by Indian tribes. *Id.* § 2701.

14. The IGRA divides gaming into three categories: Class I, Class II, and Class III. Class I gaming is defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.*§ 2703(6).  Class II gaming is defined as

> the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) . . . including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and card games that (I) are explicitly authorized by the laws of the State, or (II) are not explicitly prohibited by the laws of the State and are played at any location in the State, but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games."

*Id.* § 2703(7)(A).  The definition of Class II gaming specifically excludes "any banking card games, including baccarat, chemin de fer, or blackjack (21) or electronic or electromechanical facsimiles of any game of chance or slot machines of any kind."  *Id.* §2703(7)(B).

15. The IGRA defines Class III gaming as "all forms of gaming that are not class I or class II gaming." *Id.* § 2703(8).

16. The IGRA directs that an Indian tribe may engage in gaming under the IGRA only on "Indian lands" "pursuant to an ordinance adopted by the Indian Tribe having jurisdiction over such lands." *Id.* § 2710(d)(1)(A)(i).

17. The IGRA defines "Indian lands" as:

(A) All lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against

alienation and over which an Indian tribe exercises governmental power.

*Id.* § 2703(4); *see also* 25 C.F.R. § 502.12(b) (defining "Indian land").

18. The IGRA further mandates that Class III gaming may only be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." 25 U.S.C. § 2710(d)(1)(C).  Such a compact must be approved by the Secretary of the Interior or his or her designee.  *Id.* § 2710(d)(8).

19. The State, as a party and federally required signatory to the Kialegee-State Gaming Compact that the Tribal Town asserts authorizes it to operate a Class III gaming facility on the Broken Arrow Property, has a direct and substantial interest in ensuring full compliance with the terms of the Kialegee-State Gaming Compact.  The State has a further interest in ensuring that all gaming authorized under IGRA only occur on "Indian lands" over which the applicable Indian tribe has jurisdiction and exercises governmental power.  The State has a still further interest in protecting its citizens and other Tribes or tribal entities having legitimate gaming facilities on Indian lands under IGRA and a valid State Gaming Compact from unauthorized and inappropriate gaming operations by ensuring that the Tribal Town's proposal does not serve as precedent for expanding casinos into areas where a tribe cannot satisfy the jurisdictional, governmental, and land status requirements of the IGRA and the applicable Gaming Compact.

20. A case of actual controversy exists between Oklahoma and the Defendants concerning whether the Tribal Town's efforts to construct and operate, or license the operation of, a Class III gaming facility on the Broken Arrow Property violates federal law and the Kialegee-State Gaming Compact.

21. Defendants have admitted the purpose of this structure is to conduct Class II and Class III gaming activities.  Statement of Defendants' counsel (May 16, 2012), p. 35, ln. 14 – 18.  Pursuant to the IGRA, the Kialegee Tribal Town may only license or engage in gaming if the gaming occurs on "Indian lands" that are "within [the] tribe's jurisdiction," 25 U.S.C. §§ 2710(b)(1), (d)(1), and over which the Kialegee Tribal Town exercises governmental power.  *Id.* § 2703(4) (B); 25 C.F.R. § 502.12(b).

22. The IGRA further mandates that Class III gaming may only be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1)(C).   The Kialegee-State Gaming Compact only authorizes licensing of and conduct of gaming operations on "its [the Tribal Town's] Indian lands as defined by IGRA."  Kialegee-State Gaming Compact, Part 5.L.

23. The Kialegee-State Gaming Compact's use of the term "its lands as defined by IGRA" makes plain that the Tribal Town must have a tribal relationship with the lands in question and must have both jurisdiction and governmental power over such lands.

24. Because the Tribal Town does not have a "reservation," the Broken Arrow Property is not within the limits of an Indian reservation within the meaning of the IGRA. *See* 25 U.S.C. § 2703(4)(A).  The Broken Arrow Property thus does not satisfy the first of the IGRA's definition of "Indian lands."

25. The Broken Arrow Property does not satisfy the second of the IGRA's definition of "Indian lands." 25 U.S.C. § 2703(4)(B).  The Broken Arrow Property is not held in trust for the Tribal Town nor is it held in trust for members of the Town or by members of the Tribal Town subject to federal restraints against alienation.

26. The Broken Arrow Property is not land within the Tribal Town's jurisdiction.

27. The question of jurisdiction "focuses principally on congressional intent and purpose, rather than recent unilateral actions" of a tribe. *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001). Jurisdiction is established by federal authority and derives from the will of Congress, not unilateral actions of a tribe or the consent of fee owners pursuant to a lease. *Miami Tribe of Oklahoma v. United States*, 656 F.3d 1129, 1145 (10th Cir. 2011).

28. There is no federal statute or act by which the federal government granted the Tribal Town jurisdiction over the Broken Arrow Property.

29. The Tribal Town lacks jurisdiction over the Broken Arrow Property, because neither the Tribal Town nor any Tribal Town member own any trust or restricted interest in the Broken Arrow Property. 25 U.S.C. § 2703(4)(B).

30. The history of federal actions regarding the Tribal Town reflects the federal government's intention that the former Creek Reservation is not the Tribal Town's reservation or former reservation and not to vest the Tribal Town with jurisdiction over the Broken Arrow Property. *See Kialegee Tribal Town v. Muskogee Area Director*, 19 IBIA 296 (April 17, 1991).

31. As between the Tribal Town and the Muscogee (Creek) Nation, the Muscogee (Creek) Nation has jurisdiction over the Broken Arrow Property. *See Kialegee Tribal Town v. Muskogee Area Director*, 19 IBIA 296 (April 17, 1991).

32. The Tribal Town and the Muscogee (Creek) Nation do not have shared jurisdiction over the Broken Arrow Property.

33. Even if the Tribal Town had jurisdiction over the Broken Arrow Property, the Tribal Town does not exercise governmental power over the property.

34. In determining whether a tribe exercises governmental power over a location, courts consider a variety of factors, including, among others, (1) whether the area is developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or by a different entity; and (5) other indicia as to who exercises governmental power over those areas. *See Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523, 528 (D.S.D. 1993).

35. The Tribal Town's actions since it initiated gaming development plans, of hanging a flag on the Broken Arrow Property and posting a sign claiming to exercise governmental authority over the property, are contractual or proprietary in nature and do not reflect jurisdiction or governmental power.  The functions the Tribal Town claims to be providing on the Broken Arrow Property are mere pretexts based on contractual or proprietary interests, not the delivery of governmental services.  There is no evidence the Tribal Town has delivered governmental services through or at the Broken Arrow Property.

36. The Tribal Town cannot establish jurisdiction and governmental power over the Broken Arrow Property by recently erecting structures or retaining private security services.

37. The Tribal Town cannot establish jurisdiction and governmental power over the Broken Arrow Property by acquiring a proprietary interest in an entity operating on lands subject to the jurisdiction and governmental power of other governments.

38. The Defendants' efforts to construct and operate a gaming facility on the Broken Arrow Property are in direct violation of the requirements of the IGRA and, with respect to Class III gaming, the Kialegee-State Gaming Compact.

39. The Defendants lack authority under IGRA and the federally approved Kialegee-State Gaming Compact to construct or operate a gaming facility on the Broken Arrow Property.

40. The Defendants' activities exceed the Tribal Town's powers under federal law and violate federal law requirements including, among others, the requirement of the IGRA that gaming operations shall only occur on lands (i) "title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by the United States against alienation," (ii) over which the Indian tribe proposing to conduct or license gaming has jurisdiction, and (iii) over which that tribe "exercises governmental power." 25 U.S.C. §§ 2703(4)(B), 2710(d)(1)(A)(i), 2710(d)(1)(c).

41. The Defendants' activities exceed the Tribal Town's powers under federal law and violate federal law requirements because the construction and management of a Class III casino on the Broken Arrow Property will violate the federally approved Kialegee-State Gaming Compact, which expressly limits the Tribal Town to conducting gaming only on "its Indian lands."

42. Oklahoma has a substantial likelihood of success on the merits of its claims in this action because the proposed Red Clay Casino is not on Indian land over which the Tribal Town has jurisdiction or over which it exercises governmental power.

43. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property,

Oklahoma will suffer irreparable injury for which there is no plain, speedy, and adequate remedy at law.

44. The State has a substantial interest in adjudicating and enforcing the Kialegee-State Gaming Compact and the IGRA prior to the violation of those laws and to prevent such violation. *See Kansas*, 249 F.3d at 1227-28; *New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1, 5 (E.D.N.Y. 2003)

45. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property, the State's interest in effectuating and ensuring compliance with the terms of the Kialegee-State Gaming Compact will necessarily be adversely affected.

46. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property, other Oklahoma tribes that have invested in gaming facility operations in reliance upon and in compliance with IGRA and a valid State gaming Compact will be adversely affected.

47. Defendants will not be prejudiced by an injunction restraining Defendants from proceeding with the construction or operation of the proposed Red Clay Casino or any gaming facility on the Broken Arrow Property because, among other reasons, the Tribal Town cannot demonstrate it has or will secure authorization to conduct or license gaming on that site.

48. Because Defendants commenced construction without exercising reasonable due diligence, and without obtaining necessary or prudent governmental approvals, Defendants are largely responsible for their own harm. Consequently, adverse effects of a

preliminary injunction on Defendants are entitled to little, if any, weight.   *See Davis v. Mineta*, 302 F.3d 1104, 1106 (10th Cir. 2002).

49. The public interest favors enforcing the statutory and regulatory framework provided by IGRA and the Kialegee-State Gaming Compact and fully litigating the legality of the Tribal Town's operation of a gaming facility on the Broken Arrow Property before any gaming may commence. *See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 760 (8th Cir. 2003).

50. The Defendants' on-going actions to inject gaming into the Broken Arrow community by constructing and placing in operation the proposed casino on the Broken Arrow Property violate the federally enforceable Kialegee-State Gaming Compact and federal law.

51. It is unnecessary for the State to post security for the issuance of this preliminary injunction. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964).

52. Because the Defendants' efforts to construct and operate a gaming facility on the Broken Arrow Property are unauthorized by IGRA and, as to Class III gaming, the Kialegee-State Gaming Compact and federal law, the Defendants, and all those acting by, through, for, or under them, are preliminarily enjoined from proceeding with development, construction, or operation of the proposed Red Clay Casino or any other gaming facility on the Broken Arrow Property, as well as continued construction of the building on the Broken Arrow Property that Defendants admit have no purpose other than gaming, during the pendency of this action or until further order of this Court.

OKLAHOMA OFFICE OF THE ATTORNEY GENERAL
M. Daniel Weitman
Assistant Attorney General
313 NE 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 521-4274
Dan.Weitman@oag.ok.gov

and

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: *s/Lynn H. Slade*
Lynn H. Slade
William C. Scott
Sarah M. Stevenson
Post Office Box 2168
500 Fourth Street, N.W., Suite 1000
Albuquerque, New Mexico  87103-2168
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
bscott@modrall.com
sms@modrall.com

ATTORNEYS FOR STATE OF OKLAHOMA

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May, 2012, a true and complete copy of the within and foregoing **STATE OF OKALHOMA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** was electronically transmitted to the Clerk of the Court using the designated mailbox at CM-ECFIntake_OKND@oknd.uscourts.gov and e-mailed to the following:

JOSEPH R. FARRIS
JFARRIS@TULSALAWYER.COM

PAULA J. QUILLIN
PQUILLIN@TULSALAWYER.COM

STEVEN K. BALMAN
SBALMAN@TULSALAWYER.COM

DENNIS J. WHITTLESEY
DWHITTLESEY@DICKINSONWRIGHT.COM

ATTORNEYS FOR KIALEGEE TRIBAL TOWN,
FLORENCE DEVELOPMENT PARTNERS, LLC &
TIGER HOBIA

DAN WEITMAN
DWEITMAN@OAG.OK.GOV
ATTORNEY FOR STATE OF OKLAHOMA

R. TOM HILLIS, OBA#12328
THILLIS@TITUSHILLIS.COM

JARED B. CAWLEY, OBA #19775
JARED_CAWLEY@HOTMAIL.COM

ATTORNEYS FOR BROKEN ARROW CITIZENS
AGAINST NEIGHBORHOOD GAMING, LLC

*s/Lynn H. Slade*
Lynn H. Slade

*W1698107.DOC*