## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-054-GKF-TLW |
| | ) | |
| TIGER HOBIA, as Town King | ) | |
| and member of the Kialegee Tribal | ) | |
| Town Business Committee; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the Motion for Preliminary Injunction [Dkt. #4] filed by plaintiff, the State of Oklahoma. The plaintiff seeks entry of a preliminary injunction prohibiting defendants from constructing or operating a casino on a restricted Indian allotment in the City of Broken Arrow, Oklahoma.

The court conducted a hearing on the Motion for Preliminary Injunction on May 16, 17 and 18, 2012, and issued a ruling on the record following closing arguments. Based upon the evidence, briefs, and arguments of counsel presented at the hearing, the court enters the following written Findings of Fact and Conclusions of Law pursuant to Rule 65 of the Federal Rules of Civil Procedure.[1] To the extent the oral pronouncement conflicts with this Opinion and Order, this written Opinion and Order controls.

---

[1] These findings and conclusions address the evidence and arguments before the court at the close of the hearing on the Motion for Preliminary Injunction. Twelve days after the hearing, defendants filed a Motion to Modify the Preliminary Injunction to allow defendants to construct a sports bar/restaurant facility on the property, and a Motion to Reconsider the Preliminary Injunction in light of subsequent changed circumstances [*see* Dkt. ##133, 136, 137]. The State objected to the motions. [Dkt. ##138-139]. Defendants filed their reply briefs on their motions on July 5, 2012. [Dkt. ##145-146]. Those motions will be addressed in separate orders.

## I. Findings of Fact

1.    Plaintiff State of Oklahoma (the "State") is a State of the United States of America.

2.    The Kialegee Tribal Town (the "Tribal Town") is not a party to this action.  By Opinion and Order filed April 26, 2012, this court denied the defendants' Rule 19 motion to dismiss, finding that the defendants had not met their burden of demonstrating the Tribal Town is a required party that must be joined in order to accord complete relief among the existing parties.  [Dkt. # 105, pp. 16-17].  The Tribal Town is federally recognized, organized under Section 3 of the Oklahoma Indian Welfare Act, 25 U.S.C. § 503 (the "OIWA"), with a Constitution and By-laws approved by the Secretary of the Interior ("Secretary") on April 14, 1941, and ratified by the Tribal Town on June 12, 1941.  The 1941 Constitution established the Kialegee Tribal Town Business Committee (the "Committee") as the Tribal Town's governing body.  [*See* Answer, Dkt. #114, ¶7; PX 2, Kialegee Tribal Town Constitution and By-Laws].

3.    Defendant Kialegee Tribal Town, a federally chartered corporation (the "Town Corporation"), is a corporation with a federal charter issued under Section 3 of the OIWA, approved by the Secretary of the Interior on July 23, 1942, and ratified by the Tribal Town on September 17, 1942 ("Charter").  [Dkt. #114, Defendants' Answer, ¶¶10, 21; DX 2, Kialegee Tribal Town Corporate Charter].

4.    Defendant Tiger Hobia is the Town King, or "Mekko," of the Tribal Town, is a member of the Committee, and is a citizen and resident of the State of Oklahoma. Defendant Hobia is also the King, or Mekko, of the Town Corporation.  [Dkt. #114, Defendants' Answer, ¶8].

2

5.     Defendant Florence Development Partners, LLC is an Oklahoma limited liability company doing business in the State of Oklahoma.  [*Id.* ¶ 9].

## A. The Kialegee Tribal Town

6.     The Tribal Town is headquartered in Wetumka, Oklahoma, which is located approximately 75 miles southeast of the allotment involved in this dispute.  [*Id.,* ¶18; PX 2, Bylaws, Art. II].

7.     At the time of the Tribal Town's federal recognition in 1941, its membership was concentrated in a 15 square mile area around Wetumka, Oklahoma, near the junction of Hughes, McIntosh, and Okfuskee Counties, Oklahoma.  [PX 21, Report Regarding the Historical Relationship of the Muscogee (Creek) Nation with the Kialegee Tribal Town, by Gary Clayton Anderson, at 28; Dkt. #130, Testimony of Gary C. Anderson ("Anderson Testimony"), 111:19-23].

8.     The Tribal Town has no reservation.  [PX 21, Anderson Report, at 44-45].  In 1990, the Tribal Town stated in an application to the BIA that it "had no land."  [PX 27, *Kialegee Tribal Town of Oklahoma v. Muskogee Area Director, Bureau of Indian Affairs,* 1991 I.D. LEXIS 59, 19 IBIA 296 (Interior Board of Indian Appeals, decided April 17, 1991) (requiring the consent of the Creek Nation to Tribal Town's application to the BIA to take land into trust, and denying the Tribal Town's application)]

9.     The Tribal Town's 1941 Constitution does not define or lay claim to any geographic or territorial jurisdiction.  [PX  2, Constitution and By-Laws of the Kialegee Tribal Town, Oklahoma].

10.   Article IV, Section 1 of the Tribal Town's 1941 Constitution provides that the "supreme governing body of the Town shall be the adult members of the Town, both

male and female who are 21 years of age or older, through the actions of the Business Committee." [*Id.*].

11.   Under Article V of the 1941 Constitution, the officers of the Tribal Town are "the Town King, 1st Warrior, 2nd Warrior, Secretary and the Treasurer."   Article VI, Section 2 of the 1941 Constitution provides that the elected officers shall "select and appoint five members to serve as an Advisory Committee. . . ." [*Id.*]

12.   Article IV of the 1941 Constitution provides that the powers of the Tribal Town are set forth in the Charter of the Town Corporation.  [*Id.*]  In two Resolutions dated May 15, 2010, authorizing actions of the Tribal Town related to the gaming venture, the Tribal Town references the powers set forth in the Corporate Charter, including but not limited to the power to sue and be sued and to enter into obligations or contracts, as providing powers exercised in the gaming activities.  [PX 6, Kialegee Tribal Town Resolution, p. 1; PX 12 (Ex. D, p.1)].

13.   Section 2 of the Corporate Charter of the Kialegee Tribal Town states that "the membership, the officers, and the management of the incorporated tribal town shall be as provided in the . . . Constitution and By-laws."  [DX 2 at K-1012].

14.   Section 3 of the Corporate Charter provides that, "subject to any restrictions contained in the Constitution and laws of the United States or in the Constitution and By-laws of the tribal town, and to the limitations of section 4 and 5 of this Charter," the Town Corporation shall have the following corporate powers as provided by section 3 of the Oklahoma Indian Welfare Act of June 26, 1936:

> . . . (b) To sue and be sued; to complain and defend in any courts; *Provided, however*, That the grant or exercise of such power shall not be deemed a consent by the tribal town or by the United States to the levy of

any judgment, lien, or attachment upon the property of the tribal town other than income or chattels specially pledged or assigned.

[*Id.* at K1012-13].

15.   In 2004, Oklahoma established a model tribal gaming compact that constitutes a "pre-approved" offer to federally recognized tribes in the State ("Model Compact").  3A Okl. St. Ann. §§ 280-81.  If a tribe accepts the Model Compact, obtains approval of the Compact by the Secretary of the Interior, and complies with the requirements of the Compact and the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 – 2721 ("IGRA"), the tribe can operate Class III gaming facilities on "its Indian lands." [*Id.,* Model Compact, Part 5(L)].

16.   On April 12, 2011, the Tribal Town accepted the Model Compact with the State of Oklahoma (the "Kialegee-State Gaming Compact").  [PX 1A, Derek Campbell Aff., with attached Kialegee-State Gaming Compact].

17.   The Secretary of the Interior approved the Kialegee-State Gaming Compact on July 8, 2011.  [*Id.*].

18.   The Kialegee-State Gaming Compact authorizes the Tribal Town to operate gaming "only on its Indian lands as defined by IGRA."  [*Id.*, Part 5(L)].

## B.  Background and History

19.   The State's first witness at the hearing was Dr. Gary Anderson, an ethnohistorian at the University of Oklahoma.  In his opening statement, Counsel for the State told the court that testimony on ethnohistory is important for a number of reasons.  First, the State said, it explains "that it was not the intent of the Interior Department to vest [the tribal town] with full powers equal to and certainly not overriding those of the Muscogee (Creek) Nation."  [Tr., Dkt. #130, pp. 11:19-12:5].  Second, counsel for the State

explained that the ethnohistorian would "testify that the same set of factors, when we look at the approval of the Muscogee Creek Nation, reflect an understanding that the Muscogee Creek Nation has the overriding tribal jurisdiction." [*Id.*, 12:6-9]. Third, the State argues that the historical record forecloses the defendants' argument that they can move 70 miles north from the center of their residence around Wetumka, Oklahoma, to an area of primary authority of the Muscogee (Creek) Nation and establish a casino "that requires a police-power form of jurisdiction and governmental control." [*Id.*, 13:16-14:3]. In its closing arguments, the State appeared to shift ground, stating: "[t]he case is not about some two-tier approach to the sovereignty of tribes. It is not about a definition of what a ["]band["] is. It is not about some distinction across the board between tribes. It is about a meticulous examination of what constitutes the Tribal Town's Indian lands and whether those criteria are satisfied, simply with respect to this parcel." [Tr., Dkt. # 132, 404:12-17]. Insofar as the State has submitted many proposed findings of fact on matters of Muscogee (Creek) history, and because the defendants contend that this court must consider Creek history contextually and apply the Creeks' understanding of their property rights and jurisdiction at the time of negotiation and execution of the Treaty of 1833, this court makes a number of findings concerning historical matters in order to address the arguments raised by the parties and to put the present controversy in historical context. The court's findings relating to Muscogee (Creek) history provide only a brief synopsis of that history and the materials relied upon by this court in making those findings were the materials admitted into the record and the testimony of plaintiff's expert.

20.   In the 1500s, the Creek people inhabited portions of what are today the States of Alabama and Georgia.  [PX 21, Anderson Report Regarding the Historical Relationship of the Muskogee (Creek) Nation with the Kialegee Tribal Town, at 2-3].

21.   Historically and traditionally, the Creeks were a confederacy of autonomous tribal towns.  *Harjo v. Andrus*, 581 F.2d 949, 951 n. 7 (D.C. Cir. 1978).  By the early 1700s, two distinct groups of Creek tribal towns had emerged, the so-called Lower Towns, with Coweta as the most significant community, and the Upper Towns, where Tuckabache became the most prominent.  Kialegee was one of the Upper Towns.  By the close of the French and Indian War in 1763, the smaller autonomous villages began to give up some status and power to the two largest communities.  [PX 21, at 5; Dkt. #130, Tr., 54:14-25].

22.   By the early 1800s the Creeks had formed a National Council.   [PX 21, at 6-7; Dkt. #130, Tr., 55:10-21, 57:21-58:17].

23.   In 1812, civil war broke out among the Creeks.  On one side stood a dissident group of traditionalist Upper Creeks, known as the "Red Sticks," who opposed white encroachment on Creek lands and the 'civilizing programs' administered by Benjamin Hawkins, the United States Indian Agent who had married a Creek woman.  The Red Sticks won the support of Upper Creek towns and selected Kialegee as their headquarters. On the other side were the Lower Creek "White Sticks," lead by William McIntosh, the son of a British military officer, who favored economic development, including cotton production.  Encouraged by the British and the Shawnee leader Tecumseh, the Red Sticks attacked the Lower Creeks in the fall of 1812, fighting pitched battles with McIntosh's forces.   In 1813, the United States government sent troops under General Andrew

Jackson, who joined forces with McIntosh and some 1,500 Lower Creeks.  Jackson and the White Sticks invaded and destroyed many Upper Creek towns, including Kialegee, and eventually killed some 800 Red Sticks at the Battle of Horseshoe Bend on March 27, 1814.  The Red Stick War had a profound effect on Creek populations, the number of Creeks living in Alabama dropping by several thousand people.  Many historians suggest that the animosity the conflict engendered lasted well into the twentieth century.  [PX 21, pp. 6-8].

24.  In 1828, nearly 3,000 Lower Creeks from the Coweta District migrated west to Oklahoma.  Others followed during the next few years.  They built communities along the Arkansas River, recreating towns called Broken Arrow, Coweta, Big Springs, and "Tulsey Town."  [PX 21, at 9; Dkt. # 130, Tr., 58:22-59:2].

25.  In 1830, Congress passed the Indian Removal Act.  In a treaty signed on March 24, 1832, seven Creek Chiefs on behalf of "[t]he Creek tribe of Indians" "cede[d] to the United States all their land, East of the Mississippi river [sic]" in exchange for lands west of the Mississippi River.  The United States agreed to provide subsistence expenses for Creeks to immigrate to Oklahoma territory, and "join their countrymen there[.]"  [PX 22, Treaty of March 24, 1832, 7 Stat. 366; Dkt. #130, Tr., 74:17-78:12]; *see also, Indian Country, U.S.A., Inc. v. State of Oklahoma,* 829 F.2d 967, 971 (10th Cir. 1987).  Article XIV of the Treaty of 1832 provided that '[t]he Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them."  [PX 22].

26.   In a subsequent treaty resolving land disputes between the Cherokees and Creeks in the country to which they had immigrated, the United States agreed to grant "a patent, in fee simple, to the Creek nation of Indians for the land assigned said nation by this treaty or convention . . ." [Treaty of Feb. 14, 1833, art. 3, 7 Stat. 417, 419].  Article IV of the 1833 Treaty, upon which defendants rely in connection with their argument that the Tribal Town shares jurisdiction over the allotment, provides in part:  "the land assigned to the Muskogee Indians, by the second article thereof, shall be taken and considered  the property of the whole Muskogee or Creek nation, as well of those now residing upon the land . . ." [*Id.*, art. 4, 7 Stat. 417, 419].

27.   Migration of the majority of Upper Creek towns came in the mid-1830s.  They built communities including Tuckabatchee and Wetumka, which held a collection of people identified with the Kialegee Town in Alabama.  [PX 21, at 9; Dkt. #130, Tr. 58:22-59:6].  The upper and lower towns were separated by approximately forty miles of prairie which was uninhabited for decades after removal.  As a result, the two groups hardly spoke to each other.  [PX 21, at 9].  When a United States Indian Agent appeared in 1837 to administer to the "Creek nation," the agent noted that each of the two groups had its own leaders.  Thus, he recognized two separate "districts," and convinced each district to select a "Principle Chief" and delegates who would meet once a year at the Creek Agency to discuss the delivery of annuity goods and money coming from the sale of Creek lands in the east.  [*Id.,* at 9-10].

28.   In 1856, the United States, six commissioners representing the Creeks, and four commissioners representing the Seminole tribes of Indians entered into a treaty whereby the Creek Nation ceded certain lands in present-day Oklahoma to the Seminoles in

exchange for compensation.  [PX 23, Treaty of August 7, 1856, 11 Stat. 699].  The treaty provided that, "[s]o far as may be compatible with the constitution [sic] of the United States, and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits."  The treaty also provided for the payment of $400,000 to be paid *per capita* under the direction of "the general council of the Creek Nation, to the individuals and members of said nation."  [PX 21, at 11; PX 23, Treaty of August 7, 1856; Dkt. #130, Tr., 81:3-83:21].

29.  The animosities spawned from the Red Stick Rebellion continued into the Civil War.  In July, 1861, the General Council of the Creek Nation ratified a treaty of alliance and friendship with the Confederate States of America.  Most men from the Lower Creek Towns (then living in the northern portion of Creek lands in Oklahoma, along the Arkansas River) joined the Confederacy and fought in the Confederate "Home Guard."  Many of the Upper Creeks (then living in the southern part of Creek lands in Oklahoma), under Upper Creek leader Opothleyahola, fled north toward Kansas.  Along the way, they fought three battles against Confederate Creeks and regular Confederate troops at the battles of Round Mountain, Chusto-Talasah in what is now Tulsa County, Oklahoma, and Chustenahlah in what is now Osage County, Oklahoma.  Upper Creek survivors made their way into Kansas, where some joined the Union, creating a Union brigade of soldiers.  [PX 21, pp. 11-12].

30.  Following the Civil War, in the Treaty of June 14, 1866, 14 Stat. 785, the United States required the Creeks to cede the western portion of their lands in Oklahoma

(estimated in the Treaty to contain 3,250,560 acres) as a penalty for its alliance with the Confederacy.  The United States agreed to pay $975,168 for the lands, with $100,000 of that amount paid to Creek soldiers who enlisted in the Federal Army and the loyal refugee Indians and freedmen who were driven from their homes by the rebel forces, to reimburse them for their losses.  The treaty affirmed that "the eastern half of said Creek lands, being retained by them, shall, except as herein otherwise stipulated, be forever set apart as a home for said Creek Nation."  The treaty makes no mention of Creek tribal towns.  [PX 21, at 12-13; PX 24, Treaty of June 14, 1866; Dkt. #130, Tr., 84:21-85:17].

31.   In 1867, the Creeks adopted a written constitution.  The constitution provided for separation of powers into executive, legislative and judicial branches.  Legislative power was lodged in a National Council, a bi-cameral body composed of a house of Kings and a house of Warriors.  Each tribal town was entitled to one member in the "house of Kings," and one in the "house of Warriors," plus an additional member in the house of Warriors for every two hundred persons.  The Creeks selected Okmulgee as their capital.  [PX 21, at 13; Tr., Dkt. #130, Tr., 61:15-62:12, Article I, 1867 Constitution].

32.   The 1867 Constitution of the Muskokee[2] Nation also provided for one Principal Chief, and one "high Court" to be composed of "five competent persons" chosen by the National Council.  The constitution divided the Nation into six districts, with each district to be furnished with one company of "Light Horsemen" – one officer and four privates to be elected for a two-year term by the vote of their respective districts.  [Articles II-IV, 1867 Constitution, PX 21 at 12-13].  In 1867, there were approximately 44 tribal towns in existence.  *Harjo v. Andrus*, 581 F.2d 949, 951 n. 7 (D.C. Cir. 1978).

---

[2] The spelling of the Nation's name has varied over the years.

33.   Dissention and distrust continued between traditionalist Creeks from the south and west and progressives from the northern parts of the Muskokee Nation.  A rebellion occurred in 1870, led by traditionalists, who distrusted the new government and were outraged at the loss of land resulting from the Treaty of 1866.  They rallied at Nuyaka, a small town outside of Okmulgee.  At one point, 300 traditionalists were confronted by several hundred progressives who feared that the traditionalists would burn the capital. More violence erupted in the 1880s when the traditionalists formed their own "rump" government under the leadership of Isparhecher (a former District Judge of the Muscogee District from 1872 to 1874), who rallied a large number of full-blood Creeks from south of the capital.  The dissidents concentrated themselves in the Wetumka District, where Isparhecher formed an army.  After Muskokee Nation Lighthorsemen arrested two of Isparhecher's men for breaking the law, Isparhecher's forces freed them during a pitched battle.  The Wetumka Creeks declared their independence in 1882.  In response, the Indian Agent, with the help of government forces, organized a militia of 1,150 men at Okmulgee, who were sent into the district to restore law and order.  In the battle, called the "Green Peach War," the dissidents were routed.  [PX 21, at pp. 13-14].

34.   In 1887, Congress passed the Dawes Act, also called the General Allotment Act, 24 Stat. 388, which provided for the allotment of tribal lands to individual tribal members.  The Five Civilized Tribes, including the Creek Nation, were excluded from the Act.  [Dkt. #130, Tr., 62:16-20].

35.   In 1893, Congress created the Dawes Commission and empowered it to seek allotment of the lands of the Five Tribes, including the Muskokee Nation.  [Act of March 3, 1893, 27 Stat. 612].

36. In 1898, Congress passed the Curtis Act, which provided for allotment of the Five Tribes' lands and authorized townsites that were opened to non-Indian ownership. [Act of June 28, 1898, 30 Stat. 495; PX 21, at 16-17; Dkt. #130, Tr., 62:18-63:14].

37. In 1901, the Creek Nation and the United States entered into a new agreement governing the allotment of the Creek Nation's lands in order to supersede a provision contained in section 30 of the Curtis Act. [PX 25, Act of March 1, 1901, 31 Stat. 861]; *see also Harjo v. Kleppe*, 420 F.Supp. 1110, 1124 (D.D.C. 1976). Under Section 23 of the 1901 agreement, the Principal Chief of the Muskogee Nation was to execute and deliver to each citizen of the Muskogee Nation an allotment "deed conveying to him all right, title, and interest of the Creek Nation and of all other citizens in and to the lands embraced in his allotment certificate." [PX 25; Tr., Dkt. #130, Tr., 90:1-93:25; PX 21, at 17-18;].

38. On August 6, 1903, as part of the allotment of those lands, an allotment deed and a homestead patent were issued to Tyler Burgess, an enrolled Creek Indian of full blood, for a total of 160 acres of "Indian restricted, individually owned land" in what is today Broken Arrow, Tulsa County, Oklahoma. [PX 12, Petition for Approval of Prime Ground Lease and supporting exhibits; PX 14-15, Answers of Marcella Giles and Wynema Capps in *Oklahoma Turnpike Authority v. 5.69 Acres of Land,* Case No. 99-cv-300-H in the U.S. District Court for the Northern District of Oklahoma].

39. Tyler Burgess was not a member of the Kialegee Tribal Town. [Dkt. #130, Tr., 31:17-20]. The tribal roll shows Tyler Burgess to have been a member of Lochapoka Town. [PX 21 at 17].

40.   In 1936, Congress enacted the Oklahoma Indian Welfare Act (the "OIWA"), which, among other things, granted "[a]ny recognized tribe or band of Indians residing in Oklahoma" the right to organize and to adopt a constitution and by-laws, and obtain corporate charters.   [Act of June 26, 1936, 49 Stat. 1967, codified as amended at 25 U.S.C. §§ 503].

41.   In 1937, some 16 Creek tribal towns remained active, maintaining "fires, squares and native ceremonial organizations."   [PX 21 at p. 27].   Those towns totaled 2,666 people, a small minority of the Creek Nation, whose population had reached 30,000 or more by that time.   *Id.*

42.   In 1941, as referenced in paragraphs 6 through 14 above, the Kialegee Tribal Town organized and adopted the "Constitution and By-Laws of the Kialegee Tribal Town, Oklahoma."   Members of the Kialegee Tribal Town may also be members of the Muscogee (Creek) Nation.   [PX 2, Article III].   Two other Creek tribal towns – the Thlopthlocco Tribal Town and the Alabama-Quassarte Tribal Town – also met the BIA's guidelines necessary for organization pursuant to the OIWA.   [*Id.*].   Thus, three of the Creek tribal towns are federally recognized.   As entities separate from the Creek Nation, the tribal towns are entitled to receive BIA funding and services directly, rather than through the Muscogee (Creek) Nation.   [PX 27, p. 2 fn. 1).

43.   In 1979, the Muscogee (Creek) Nation, pursuant to the OIWA, adopted a new constitution providing for three separate branches of government.   The 1979 Constitution declares, among other things, that "the political jurisdiction of The Muscogee (Creek) Nation shall be as it geographically appeared in 1900 which is based upon those Treaties entered into by the Muscogee (Creek) Nation and the United States of America. . . ."

The Acting Deputy Commissioner of Indian Affairs approved the constitution on August 17, 1979.  [PX 3, Constitution of the Muscogee (Creek) Nation].  Citizenship in the Muscogee (Creek) Nation include persons who are lineal descendants of a Muscogee (Creek) Indian by blood whose name appears on the final rolls prepared pursuant to the Act of April 26, 1906 (34 Stat. 137).  Id., at Article III.  Members of the Kialegee Tribal Town who meet the requirements of citizenship in the Muscogee (Creek) Nation are citizens of the Muscogee (Creek) Nation.

44.  In 2002, the Muscogee (Creek) Nation adopted a gaming code, enacted as Chapter 21 of the Muscogee (Creek) Nation Code.  The gaming code requires any person conducting gaming on Muscogee (Creek) Nation property to have a valid and current public gaming license issued by the Gaming Commissioner of the Muscogee (Creek) Nation.  21 Muscogee (Creek) Nation Code, Title 21, § 3-101(A).  The code prohibits any other forms of public gaming operations being conducted within the jurisdiction of the Muscogee (Creek) Nation without the written approval of the Gaming Commissioner.  21 Muscogee (Creek) Nation Code, Title 21, § 3-101(B).

### C.  The Kialegee Tribal Town's Casino Project

45.  At the time of the hearing on the State's Motion for Preliminary Injunction, the defendants were actively constructing the "Red Clay Casino," a gaming facility providing Class II and Class III gaming, on property located at the southwest corner of Olive Avenue (South 129th East Avenue) and Florence Street (South 111th Street East), in Broken Arrow, Oklahoma (the "Broken Arrow Property").  Testimony at the hearing was that the defendants intended to operate the Casino by Labor Day, 2012.  The Broken Arrow Property is more particularly described as follows:

The East 1245.3 feet of the North 1245.3 feet of the Northeast quarter of Section Thirty Two (32), Township Eighteen (18) North, Range Fourteen (14) East of the Indian Base and Meridian, Tulsa County, State of Oklahoma, less and except one acre reserve as life Estate for Willis G. Burgess:

LESS AND EXCEPT

A STRIP, PIECE OR PARCEL OF LAND LYING IN PART OF THE Northeast Quarter (NE1/4) of Section 32, Township 18 North, Range 14 East of the Indian Base and Meridian, Tulsa County, Oklahoma.  Said parcel of land being described as follows:

Beginning 726.22 feet south of the Northeast corner of said NE 1/4; THENCE South 01°13'28" East along the East Line of said NE ¼ a distance of 519.08 feet; THENCE South 88°38'08" West a distance of 65.00 feet; THENCE North 02°37'56" East a distance of 520.42 feet; THENCE North 88°46'32" East a distance of 30.00 feet to the POINT OF BEGINNING, containing 24,660 square feet or 0.57 acres, more or less.

AND

Beginning 793.14 feet West of the Northeast corner of said NE ¼; THENCE South 01°22'07" East a distance of 30.00 feet; THENCE South 01°23'59" East a distance 20.00 feet; THENCE South 85°29'21" West a distance of 453.05 feet; THENCE North 01°13'22" West a distance of 74.75 feet to a point on the North line of said NE ¼; THENCE North 88°37'08" East along the North line of said NE ¼ a distance of 452.16 feet to the POINT OF BEGINNING, containing 28,211 square feet or 0.65 acres, more or less.

AND

Commencing at the Northeast corner of said NE ¼; THENCE South 01°13'28" East along the East line of said NE ¼ a distance of 1245.30 feet; THENCE South 88°37'05" West a distance of 440.04 feet to the POINT OF BEGINNING, THENCE continuing South 88°37'05" West a distance of 805.26 feet; THENCE North 01°13'28" West a distance of 423.92 feet; THENCE Southeasterly on the arc of a curve to the left, said curve having a radius of 2101.83 feet (said curve being sub-tended by a chord bearing South 51°32'54" East, and a chord length of 224.89 feet), an arc distance of 225.00 feet; THENCE South 60°18'28" East a distance of 455.51 feet; THENCE South 80°52'21" East a distance of 245.38 feet to the POINT OF BEGINNING, containing 129,289 square feet or 2.97 acres, more or less.

[Dkt. #114, Defendants' Answer, ¶31].

46.   The Broken Arrow Property is located within the geographical boundaries of the Muscogee (Creek) Nation as it appeared in 1900.  [Dkt. #130, Tr., 142:9-13].

47.   The Broken Arrow Property is a portion of the 160 acres of restricted fee land originally allotted to Tyler Burgess in 1903.

48.   The Broken Arrow Property has since passed by descent to two heirs of Tyler Burgess, sisters Wynema L. Capps ("Capps") and Marcella S. Giles ("Giles"), who hold the property as tenants in common, subject to federal restrictions and restraints against alienation.  [PX 14-15].  Neither Capps nor Giles reside on the property.  Capps resides in Welty, Oklahoma; Giles is an attorney living in McLean, Virginia.

49.   As of the close of the hearing on plaintiff's motion for preliminary injunction on May 18, 2012, neither Capps nor Giles was an enrolled member of the Tribal Town. Capps and Giles are enrolled members of the Muscogee (Creek) Nation. [Dkt. #127-2, Court's Ex. 1, Email listing stipulations agreed to by counsel].

50.   The Broken Arrow Property is located more than 70 miles north of the Tribal Town's Headquarters in Wetumka, Oklahoma.

51.   The Broken Arrow Property is not held in trust by the United States for the benefit of the Tribal Town.  [Dkt. #114, Defendants' Answer, ¶ 38].

52.   The Broken Arrow Property is not held in trust by the United States for the benefit of an enrolled member of the Tribal Town.  [*Id.*, ¶ 39].

53.   As of May 18, 2012, the Broken Arrow Property was not held by either the Tribal Town or an enrolled member of the Tribal Town subject to restriction by the United States against alienation.

54. The Tribal Town has no property interest in the Broken Arrow Property. [Dkt. #131, Tr., 349:1-5].

55. In May of 2010, the Kialegee Tribal Town, as Tenant, executed a Prime Ground Lease with Capps and Giles, as Landlord, for the Broken Arrow Property as a site for a proposed casino facility. [PX 12, pp. OK-00260—00295].

56. On January 27, 2011, Capps and Giles filed a petition in the District Court in and for Tulsa County, Oklahoma, pursuant to the Act of August 4, 1947, 61 Stat. 731 (the "1947 Act"), seeking court approval of the proposed Prime Ground Lease. [PX 12]. The 1947 Act declares, in relevant part, that "no conveyance, including an oil and gas or mineral lease, of any interest in land acquired before or after the date of this Act by an Indian heir or devisee of one-half or more Indian blood when such interest in land was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated."

57. On August 17, 2011, the Tulsa County District Court entered an order withholding its approval of the Prime Ground Lease. [Order of 10/17/11, *In the Matter of the Approval of the Prime Ground Lease Agreement of Marcella S. Giles and Wynema L. Capps*, Case No. FB-2011-1 in the District Court of Tulsa County, Oklahoma]. The state court ruled, among other things, that it was not the appropriate forum to resolve intertribal jurisdictional disputes between the Muscogee (Creek) Nation and the Kialegee Tribal Town, and concluded that "an individual citizen cannot transfer government jurisdiction over his or her property by the terms of a lease."

58.   In the meantime, on May 10, 2011, Capps and Giles, as Landlord, entered into a separate Ground Lease Agreement with Defendant Florence Development Partners, LLC, as Tenant, pertaining to the Broken Arrow Property (the "May 2011 Lease").   [PX 7]. On approximately December 1, 2011, the May 2011 Lease was amended by a First Amendment to Ground Lease Agreement [PX 8] to add the Tribal Town as a signatory party.   On January 3, 2012, a Memorandum of Lease describing the essential terms of the May 2011 Lease, as amended, was recorded in the office of the Tulsa County Clerk as Document No. 2012000124.   [PX 9; Dkt. #131, Tr., 325:20-329:20].

59.   Under the May 2011 Lease, Capps and Giles, as Landlord, purported to lease the Broken Arrow Property to Florence Development Partners, LLC, as Tenant, "for a term commencing on the later of May 10, 2011 or the Effective Date (as defined in the Lease) and shall expire on April 1, 2017."   The lease was written to have a term of six year and 11 months so it would not have to be approved by the Secretary of Interior or his designee. [Dkt. #131, Tr., 326:10-19].   The May 2011 Lease grants defendant Florence Development Partners, LLC, as Tenant, "the right, privilege, and option to extend the Term of the Lease for four (4) periods of ten (10) years each, upon and subject to the terms and conditions contained in the Lease."   The ultimate duration of the May 2011 Lease could, therefore, exceed 46 years.   [PX 7, ¶ 2 and Exhibit "D" thereto, ¶ 2; PX 9, ¶¶ 1, 2].   At the hearing, the defendants took the position that the May 2011 Lease is void by operation of law because it is on restricted land and had not received secretarial approval.   [Dkt. #131, Tr., 328:15-329:14].   However, the May 2011 Lease, as amended, has not been formally terminated by its parties, and defendant Florence Development Partners, LLC could theoretically present the Lease to the Secretary for approval.   [*Id.*,

329:15-20].  Instead of pursuing the gaming venture by means of the May 2011 Lease, defendants decided to utilize a joint venture agreement.  [*Id.*, Tr., 329:21-24].

60.  In May, 2011, Golden Canyon Partners, LLC, Giles, Capps, and the Kialegee Tribal Town, entered into the Operating Agreement of Florence Development Partners, LLC. to create a joint venture to build and operate the Red Clay Casino.  [PX 16].  Luis Figueredo, a principal of Golden Canyon Partners, LLC, testified at the hearing that the Operating Agreement had been voided "approximately a month" before the hearing "because there was some provisions in the agreement that could be perceived by the Department of Interior to be encumbrances.  And in order for the joint venture agreement to comply with the Court's dicta or the Court's guidance in the *GasPlus* case, you cannot create an encumbrance on the property.  So we carefully examined the operating rules and revised them so that we would be in compliance with applicable law regarding encumbrances on Indian land."  [Dkt. #131, Tr., 330:19-331:2].

61.  By letter dated September 29, 2011, NIGC Chairwoman Tracie L. Stevens advised Town King Tiger Hobia that the NIGC had approved three amendments to the Kialegee Tribal Town's gaming ordinances, but cautioned:  "My approval of this ordinance does not constitute a determination that the Tribe has jurisdiction over that parcel or that the parcel constitutes Indian lands eligible for gaming under IGRA."  [PX 10; Dkt. #131, Tr., 321:11-323:14].

62.  In December, 2011, defendants proceeded with actual construction of the casino on the Broken Arrow Property by commencing grading and site preparation.  At the time of the hearing, the structure was up and the inside sprinkler systems were in place.  [Dkt. #131, Tr., 303:23-304:17].

63. On May 1, 2012, Giles, Capps, and Golden Canyon Partners entered into the Amended and Restated Joint Venture Operating Agreement of Florence Development Partners, LLC. [PX 17]. The Amended and Restated Operating Agreement removed the Kialegee Tribal Town as a member because the NIGC had told Figueredo that the previous operating agreement would violate the NIGC's "sole proprietary interest rule." The Amended and Restated Joint Venture Operating Agreement is the agreement currently governing the company developing the Red Clay Casino facilities. [Dkt. #131, Tr., 331:3-332:4].

### D.  Provision of Governmental Services

64. Most governmental services in the area of the Broken Arrow Property are provided by the City of Broken Arrow. The City of Broken Arrow Police, the Tulsa County Sheriff, and/or the Muscogee (Creek) Lighthorse Police provide law enforcement in the area. The City of Broken Arrow Fire Department provides fire and emergency medical services. The City of Broken Arrow provides water and sanitary sewer services to the area. Educational services in the area of the Broken Arrow Property are provided by the Broken Arrow Municipal School District. The Kialegee Tribal Town does not provide law enforcement or other services to the Broken Arrow Property. [Dkt. #131, Tr., 221:23-25; 232:1-16].

65. The Tribal Town does not have a police force. [Court's Ex. 1; Dkt. # 131, Tr. 346:10-12].

66. The Tribal Town does not have a court or a jail. [*Id.*, 346:10-16].

67. No Tribal Town members live on near the Broken Arrow Property. [*Id.*, 315:3-20, 349:22-350:1].

68.   Law enforcement, fire, or emergency services for the Broken Arrow Property are provided by the City of Broken Arrow, the County of Tulsa, the State of Oklahoma, or the Muscogee (Creek) Nation pursuant to a cross-deputization agreement between the Muscogee (Creek) Nation and political subdivisions of the State of Oklahoma.  The City of Broken Arrow signed the agreement in July, 2006.  [PX 32, Intergovernmental Cross-Deputization Agreement; Dkt. #131, Tr., 233:5-234:15].

69. The Tribal Town does not have a cross-deputization agreement with the City of Broken Arrow.  [*Id.*, 234:21-25].

70. After casino development efforts commenced, the Tribal Town opened a satellite office in the residence located on the Broken Arrow Property, and staffed the office with a Kialegee employee.  Brochures for grant programs, education programs and health programs are available to tribal members on site.  [Id., 307:1-308:11].

### E.  Exercise of Governmental Control

71.   Prior to initiation of efforts to develop and build a casino on the Broken Arrow Property, the Tribal Town did not exercise governmental authority and control over the Broken Arrow Property.  After development efforts commenced, the Tribal Town fenced the property, began flying the Kialegee flag from the residential garage on the property, posted signs stating the property was under the governmental control of the Kialegee Tribal Town, opened a satellite office in an existing house on the property, held business meetings in the house, and hired security to patrol the property.  [Dkt. #131, Tr., 307:20-309:21].

### F.  NIGC Determination of Eligibility for Gaming

72.     As of May 18, 2012, the day this court granted plaintiff's Motion for

Preliminary Injunction by a ruling from the bench, the defendants had not obtained an

NIGC determination that the site is eligible for Class III gaming.[3]

### G.  The Public Interest

73.   The public has an interest in the enforcement of state and federal laws--including

gaming laws and compacts.

74.   The public interest would not be harmed by the entry of a preliminary injunction

barring continued construction and operation of the proposed Red Clay Casino because

there are ample alternative venues available to the gaming public in the greater Tulsa

metropolitan area, including the Cherokee Nation's Hard Rock in Catoosa, Oklahoma;

the Muscogee (Creek) Nation's River Spirit Casino in Tulsa, Oklahoma; and the Osage

Nation's Osage Casino in Tulsa, Oklahoma.

### II.  Conclusions of Law

### A.  Jurisdiction and Venue

1.   This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, and has jurisdiction over the parties to this action.

2.   The *Ex parte Young* doctrine is an exception to tribal sovereign immunity.  *Crowe*

*& Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1154 (10th Cir. 2011).   The doctrine

---

[3]  On May 25, 2012, the NIGC notified Town King Tiger Hobia that the NIGC Office of
General Counsel had opined that the Kialegee Tribal Town does not have jurisdiction
over the Broken Arrow Property, and that the Department of the Interiors's Office of the
Solicitor concurred with that opinion.  [Dkt. #134, Ex. 1].  NIGC Chairwoman Stevens
directed the Kialegee Tribal Town "not to commence gaming under IGRA on the
Proposed Site."  [*Id.*].

proceeds on the fiction that an action against a tribal official seeking only prospective injunctive relief is not an action against the tribe and, as a result, is not subject to the doctrine of sovereign immunity.  *Id.*  By adhering to this fiction, the *Ex parte Young* doctrine "enables federal courts to vindicate federal rights and hold [tribal] officials responsible to the supreme authority of the United States."  *Id., quoting Pennhurst State Scho. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).  Moreover, tribal sovereign immunity does not extend to a tribal official when the official is acting outside the scope of the powers that have been delegated to him.  *Burrell v. Armijo*, 603 F.3d 825, 832 (10th Cir. 2010).  If a sovereign tribe does not have the power to take an action, then the tribal official by necessity acted outside the scope of his authority by taking the action on behalf of the tribe, making him liable to suit.  Any other rule would mean that a claim of sovereign immunity would protect a sovereign in the exercise of power it does not possess.  *Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Oklahoma*, 725 F.2d 572, 574 (10th Cir. 1984).

3.  The "sue and be sued" language in the Town Corporation's Corporate Charter may constitute a waiver of sovereignty immunity in actions involving the corporate activities of the tribe.  *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 491 F. Supp. 2d 1056, 1065 (N.D. Okla. 2007), *aff'd,* 546 F.3d 1288 (10th Cir. 2008).

4.  Venue is proper under 28 U.S.C. § 1391(b)(2) because the Broken Arrow Property is located in the Northern District of Oklahoma and a substantial part of the events giving rise to the claims in this case occurred in this district.

### B.  Preliminary Injunction Factors

5.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

6.  To obtain a preliminary injunction, a plaintiff must show:  "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public's interest.  *Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1157 (10th Cir. 2011).

7.  The Tenth Circuit has identified three types of specially disfavored preliminary injunctions as to which a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issues":  (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).  Any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.  *Id.*  A party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.  *Id.* at 976; *Schrier v. University of Co.* 427 F.3d 1253, 1259 (10th Cir. 2005).

8.  Defendants assert the injunction sought is one that alters the status quo and thus, the State bears a heightened burden.  The court disagrees.  The "status quo" is the "last peaceable uncontested status between the parties before the dispute developed."  Schrier v. Univ. of Colorado, 427 F.3d 1253, 1260 (10th Cir. 2005).  Here, the last peaceable uncontested status was immediately before the defendants commenced construction activities on the Broken Arrow Property.  Therefore, the court finds the requested injunction would not alter the "status quo" as defined by the Tenth Circuit.

9.  Even if the injunction sought by the State is determined to be one that alters the status quo, this court concludes the State has met the heightened burden by making a strong showing of likelihood of success on the merits and with regard to the balance of harms.

## C.  Analysis of Preliminary Injunction Factors

### 1.  Likelihood of Success on the Merits

10. Section 2710(d)(1)(A)(i) of IGRA provides in pertinent part that an Indian tribe may lawfully engage in Class III gaming only on "Indian lands" "of the Indian tribe having jurisdiction over such lands."  25 U.S.C. § 2710.

11. The term "Indian lands" is defined in IGRA as:

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4); *see also* 25 C.F.R. § 502.12(b).

12. IGRA further mandates that Class III gaming may only be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." 25 U.S.C. § 2710(d)(1)(C).

13. The State, as a party and federally required signatory to the Kialegee-State Gaming Compact, has a direct and substantial interest in ensuring full compliance with the terms of the Compact. *See Kansas v. United States,* 249 F.3d 1213, 1223-24 (10th Cir. 2001) (noting state has "significant governmental interest" in Class III gaming). The State has an interest in ensuring that all gaming authorized under IGRA only occur on "Indian lands" over which the applicable Indian tribe has jurisdiction and exercises governmental power. *Id.* at 1228. The State also has an interest in protecting its citizens and other tribes or bands of Indians having legitimate gaming facilities on Indian lands under IGRA and a valid State Gaming Compact from unauthorized and inappropriate gaming operations by ensuring that the Tribal Town's proposal does not serve as precedent for expanding casinos into areas where a tribe cannot satisfy the jurisdictional, governmental, and land status requirements of IGRA and the applicable Gaming Compact. *Id.*

14. A case of actual controversy exists between the State of Oklahoma and the defendants concerning whether the Tribal Town's efforts to construct and operate, or license the operation of, a Class III gaming facility on the Broken Arrow Property violates federal law and the Kialegee-State Gaming Compact.

15. Defendants have admitted the purpose of this structure is to conduct gaming activities. Statement of Defendants' counsel (May 16, 2012), Dkt. #130, 35:14-18. Pursuant to IGRA, the Kialegee Tribal Town may only license or engage in Class II or III

gaming if the gaming occurs on "Indian lands" that are "within [the] tribe's jurisdiction," 25 U.S.C. §§ 2710(b)(1), (d)(1), and over which the Kialegee Tribal Town exercises governmental power. *Id.* § 2703(4) (B); 25 C.F.R. § 502.12(b).

16. IGRA further mandates that Class III gaming may only be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1)(C). The Kialegee-State Gaming Compact only authorizes licensing of and conduct of gaming operations on "its [the Tribal Town's] Indian lands as defined by IGRA." Kialegee-State Gaming Compact, Part 5.L. The Kialegee-State Gaming Compact's use of the term "its lands as defined by IGRA" makes plain that the Tribal Town must have a tribal relationship with the lands in question and must have both jurisdiction and governmental power over such lands.

17. Courts have uniformly held tribal jurisdiction is a threshold requirement to the exercise of governmental power as required under IGRA's definition of Indian lands. *See, e.g., Kansas,* 249 F.3d at 1229 (holding that "before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land"); *Miami Tribe of Oklahoma v. United States,* 927 F. Supp. 1419, 1423 (D. Kan. 1996) ("Absent jurisdiction, the exercise of governmental power is, at best, ineffective, and at worst, invasion.")

18. The question of jurisdiction "focuses principally on congressional intent and purpose, rather than recent unilateral actions" of a tribe. *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001). Jurisdiction is established by federal authority and derives from the will of Congress, not unilateral actions of a tribe or the consent of fee

owners pursuant to a lease. *Miami Tribe of Oklahoma v. United States*, 656 F.3d 1129, 1145 (10th Cir. 2011).

19. The Broken Arrow Property is not within the limits of an Indian reservation. The Broken Arrow Property therefore does not fall within the first category of "Indian lands" under § 2703(4)(A) of IGRA.

20. The Broken Arrow Property is not held in trust by the United States for the benefit of any Indian tribe or individual and does not thereby fall within the second category of "Indian lands" set forth in § 2703(4)(B) of IGRA.

21. The Broken Arrow Property *is* Indian land that is "held by [an] . . . individual subject to restriction by the United States against alienation." as set forth in § 2703(4)(B) of IGRA. The parties dispute, however, whether the Kialegee Tribal Town has "jurisdiction" over the Broken Arrow Property as required by IGRA. 25 U.S.C. § 2710(d)(1). The State contends the Muscogee (Creek) Nation—and not the Kialegee Tribal Town—has jurisdiction over the property because it is the successor in interest to the historic Creek Nation. The Tribal Town asserts it shares jurisdiction with the Muscogee (Creek) Nation because it, too, is a successor in interest to the historic Creek Nation.

22. Courts and/or administrative agencies have addressed the issue of shared jurisdiction over property which is part of an Indian reservation or which is held in trust by the United States for the benefit of an Indian tribe.[4] However, the question of shared jurisdiction of restricted Indian allotments appears to be an issue of first impression.

---

[4] *See Williams v. Clark*, 742 F.2d 549 (9th Cir. 1984) (finding Quileute Tribe and Quinault Tribe shared jurisdiction in the Quinault Reservation; *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1143 (10th Cir. 2011) (acknowledging that members of the Thlopthlocco Tribal Town reside on land held in trust for them by the United States, which is located within the historic boundaries of the Creek Nation); June 24,

23. Defendants contend the Kialegee and the (Muscogee) Creek Nation have shared jurisdiction over the Tyler Burgess Allotment based on Article 4 of the 1833 Treaty, which provided the lands assigned in Oklahoma were to be "taken and considered the property of the whole Muscogee or Creek nation." Treaty of Feb. 14, 1833, art. 4, 7 Stat. 417, 419. Defendants assert the 1833 Treaty has never been abrogated and the Creek Nation's history as a confederacy of autonomous tribal towns, combined with the tribe's view of property rights as being communal in nature, compels the conclusion that the modern day Muscogee (Creek) Nation, the Kialegee Tribal Town, the Thlopthlocco Tribal Town and the Alabama-Quassarte Tribal Town all share jurisdiction over all lands conveyed by the 1833 Treaty.

24. In support of their position, defendants invoke the Indian canons of construction and the doctrine of originalism. "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766 (1985). One of the canons is that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id. See also United States v. 162 Megamania Gambling Devices,* 231 F.3d 713, 718 (10th Cir. 2000). "[I]f [an ambiguous law] can reasonably be construed as the Tribe would have construed it, it *must* be construed that way." *Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439 , 1445 (D.C. Cir. 1988). Under the doctrine of tribal originalism, treaties must be interpreted so as to "give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs*

---

2009 Decision of the Assistant Secretary—Indian Affairs in United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region (finding both the United Keetowah Band and the Cherokee Nation of Oklahoma are successors-in-interest to the historical Cherokee Nation and both were entitled to have land taken into trust by the Bureau of Indian Affairs pursuant to the OIWA).

*Band of Chippewa Indians,* 526 U.S. 172, 196 (1999).  "[W]e look beyond the written words to the larger context that frames the Treaty, including "the history of the treaty, the negotiations, and the practical construction adopted by the parties."  *Id.   See also Absentee Shawnee Tribe of Indians of Oklahoma v. State of Kansas,* 862 F.2d 1415, 1418 (10th Cir. 1988).

25. Even applying these canons of construction, however, the jurisdictional view now urged by defendants does not appear to be one that is now or was *ever* a consensus view of the Creek Nation or its tribal towns.

26.  Every federal treaty or law related to the property recognizes the Muscogee (Creek) Nation's authority.  The Treaty of 1833 granted a patent in fee simple to "the Creek nation of Indians for the land assigned said nation by this treaty or convention…" and the assigned land was to be "taken and considered the property of the whole Muskogee or Creek nation, as well of those now residing upon the land."  Treaty of Feb. 14, 1833, art. 3 and 4, 7 Stat. 417, 419. The Treaty of August 7, 1856, among the Creeks, Seminoles and United States, provided "the Creeks and Seminoles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits" and payment of $400,000 to be paid *per capita* under "the general council of the Creek Nation, to the individuals and members of said nation." Treaty of August 7, 1856.  The Treaty of June 14, 1866, which forced the Creek Nation to cede the western portion of their lands in Oklahoma as a penalty for its alliance with the Confederacy, affirmed that the remaining lands were to be "forever set apart as a home for said Creek Nation," with no mention of the tribal towns. Treaty of June 14, 1866.  The Act of March 1, 1901, governing allotment of the Creek Nation's lands,

stated, "The words 'Creek' and 'Muskogee' as used in this agreement shall be deemed synonymous, and the words 'Nation' and 'Tribe' shall each be deemed to refer to the Muskogee Nation or Muskogee tribe of Indians in Indian Territory." 32 Stat., 500, June 30, 1902.   The Act provided that the Principal Chief of the Muskogee Nation was to execute and deliver to each citizen of the Muskogee Nation an allotment "deed conveying to him all right, title, and interest of the Creek Nation." *Id.,*

27. The Broken Arrow Property is located within the territory described by the written constitution of the "Muskokee Nation" adopted in 1867.   The constitution encompassed all Creek Nation members, Article I, 1867 Constitution.   Each of the approximately 44 tribal towns was entitled to representation in the National Counsel. *Id.*; *Harjo,* 581 F.2d 949, 951 n. 7.   No tribal towns had a separate constitution.

28. The Kialegee Tribal Town's Constitution, adopted in 1941 pursuant to the OIWA, neither claims nor defines any geographic or territorial jurisdiction of the Tribal Town. [PX 2].

29. In contrast, the Muscogee (Creek) Nation's 1979 Constitution states, "the political jurisdiction of The Muscogee (Creek) Nation shall be as it geographically appeared in 1900 which is based upon those Treaties entered into by the Muscogee (Creek) Nation and the United States of America." [PX 3, Art.1, Section 2].

30. In 1990, the Kialegee Tribal Town sought to acquire two parcels of land located in Tulsa County, Oklahoma, in trust.   In its application to the BIA, the Tribal Town stated that it "presently had no land."   The Area Director of the BIA informed the Tribal Town that its request could not be considered without the concurrence of the Muscogee (Creek) Nation, as required by 25 CFR 151.8, because the parcels in question were located within

the boundaries of the Nation's former reservation.  The Tribal Town appealed the decision to the Board of Indian Appeals, which affirmed the Area Director's decision. The Board held that, "[b]ecause the former Creek Reservation is the Nation's reservation, and not the [Kialegee Tribal Town's] reservation, section 151.8 requires the written consent of the Nation before land within the reservation may be taken in trust for the benefit of [the Kialgee Tribal Town]." *Kialegee Tribal Town of Oklahoma v. Muskogee Area Director, Bureau of Indian Affairs,* 19 IBIA 296, 1991 I.D. LEXIS 59 at *3 (April 17, 1991).

31. The Broken Arrow Property is within the territory described in federal treaties with the Muscogee (Creek) Nation and in both the 1867 Muskogee Nation Constitution and the present Constitution of the Muscogee (Creek) Nation approved by the Department of Interior.  Tyler Burgess—the original allottee of the property—was a member of the Muscogee (Creek) Nation and the Lockapoka Tribal Town.  He was not a member of the Kialegee Tribal Town.  The Broken Arrow Property is located 70 miles away from the headquarters of the Kialegee Tribal Town.

32. To date, no court or administrative agency has applied the concept of shared jurisdiction to restricted allotments.  Moreover, the individual nature of allotments, as opposed to reservations and land held in trust for the tribe as a whole, is worth noting. The Supreme Court has explained the objective of allotment of land to individual tribal members was "to end tribal land ownership and to substitute private ownership, on the view that private ownership of individual Indians would better advance their assimilation as self-supporting members of our society and relieve the Federal government of the need

to continue supervision of Indian affairs." *Northern Cheyenne Tribe v. Hollowbreast,* 25 U.S. 649, 651 n. 1 (1976).

32. When land is allotted in fee or placed in trust for an individual member of the tribe, any tribal property interest in the allotted parcel is eliminated. Individual allottees "have vested property rights, including valuable appurtenances to the land such as water rights, grazing rights, and rights to timber, minerals, and fossils." Cohen's Handbook of Federal Indian Law, 2005 ed., § 16.03[3][a]. During the period of restriction, federal law protects allotments against alienation, encumbrance, and taxation. *Id.*, § 16.03[3][b]. If federal restrictions on alienation are removed from a restricted allotment, the allottee owns the land in fee simple absolute. *Id.*, § 1603[4][b][i]. Under the Creek Allotment Act of 1901, the principal chief of the Creek Nation executed and delivered allotment deeds to each citizen of the tribe. The allotment deeds conveyed "all right, title and interest of the Creek Nation and of all other citizens in and to the lands embraced in [the] allotment certificate." 31 Stat. 861, ¶ 23, March 1, 1901. In the 1901 Act, Congress recognized the jurisdiction of the national council of the Creek Nation over "the lands of the tribe, or of individuals after allotment" through the acts, ordinances and resolutions approved by the President of the United States. *Id.*, at ¶ 42.

33. The Kialegee Tribal Town—like the Alabama-Quassarte and Thlopthlocco Tribal Towns—are separately recognized tribal entities under the OIWA. However, all Creek tribal towns are subset groups or "bands" of the Muscogee (Creek) Nation. *See* 1 *Op. Sol. On Indian Affairs* 478, Solicitor's Opinion M-27796, Nov. 7, 1934 (finding the tribal towns "retain sufficient characteristics of a band to identify them as Indian bands."). The Muscogee (Creek) Nation did not abolish the tribal towns. Rather, it explicitly

recognizes them in Article II, Section 5 of its 1979 Constitution: "[t]his Constitution shall not in any way abolish the rights and privileges of persons of the Muscogee (Creek) Nation to organize tribal towns or recognize its Muscogee (Creek) traditions."

34. Although separately recognized by the federal government, the Kialegee Tribal Town does not have "shared jurisdiction" over all lands within the historic bounds of the Creek Nation.  If the Tribal Town shares jurisdiction over those lands as it claims, the likely result will be "races" between the four federally recognized Creek entities to establish governmental control over parcels of Indian Country within those historic bounds.

35. The court concludes the Kialegee Tribal Town does not share jurisdiction with the Muscogee (Creek) Nation over the Broken Arrow Property.  The Muscogee (Creek) Nation alone, as successor in interest to the historical Creek Nation, has jurisdiction over restricted allotment which constitutes the Broken Arrow Property.

36. This court need not decide here whether the Kialegee Tribal Town may share jurisdiction with the Muscogee (Creek) Nation over other restricted allotments which were originally allotted to members of the Creek Nation who were also members of the Kialegee Tribal Town.

37. The court concludes, under the facts presented, the Broken Arrow Property does not meet the requirement, set forth in the Kialegee-State Gaming Compact, of being "its (the Kialegee Tribal Town's) Indian lands as defined by IGRA."

38. Even if the Tribal Town shares jurisdiction with the Muscogee (Creek) Nation over the Broken Arrow Property, the Tribal Town does not exercise governmental power over the property within the meaning of IGRA, 25 U.S.C. § 2703(4).

39. Meeting the "exercise of governmental power" requirement "does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority." *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 703 (1st Cir. 1994). In determining whether a tribe exercises governmental power over a location, courts consider a variety of factors, including (1) whether the area is developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or by a different entity; and (5) other indicia as to who exercises governmental power over those areas. *See Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523, 528 (D.S.D. 1993).

40. With respect to these factors, the Broken Arrow Property is not developed, and no Kialegee Tribal Town members reside on or near it. Water and sewer services are provided by the City of Broken Arrow. Law enforcement is provided by the City of Broken Arrow, the Tulsa County Sheriff and/or the Muscogee (Creek) Lighthorse Police. The Tribal Town provides no fire, emergency, medical or educational services at the Broken Arrow Property. The Tribal Town's actions since it initiated gaming development plans, i.e., fencing the property, hiring a private security service, opening a satellite office, making brochures available at the office, hanging a flag on the front of a former residence on the Broken Arrow Property and posting a sign claiming to exercise governmental authority over the property, are merely proprietary in nature and/or pretextual attempts to "manufacture" the exercise of government authority. The Tribal Town's actions do not comprise actual delivery of governmental services. There is no

evidence the Tribal Town has delivered any substantive governmental services through or at the Broken Arrow Property, as described in *Cheyenne River Sioux Tribe.*

41. Defendants have failed to show the Kialegee Tribal Town has exercised governmental authority sufficient to establish the Broken Arrow Property is its "Indian lands" under 25 U.S.C. § 2703(4).

42. The defendants' efforts to construct and operate a gaming facility on the Broken Arrow Property are in direct violation of the requirements of IGRA and, with respect to Class III gaming, the Kialegee-State Gaming Compact. 25 U.S.C. § 2710(b) and (d); Kialegee-State Gaming Compact, Part 5(L).

43. The defendants lack authority under IGRA and the federally approved Kialegee-State Gaming Compact to construct or operate a gaming facility on the Broken Arrow Property. *Id.*

44. Operation of a casino on the Broken Arrow Property would exceed the Tribal Town's powers under federal law and violate federal law requirements including, among others, the requirement of IGRA that gaming operations shall only occur on Indian reservations or lands: (i) "title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by the United States against alienation," (ii) over which the Indian tribe proposing to conduct or license gaming has jurisdiction, and (iii) over which that tribe "exercises governmental power." 25 U.S.C. §§ 2703(4), 2710(d)(1)(A)(i). Specifically, the Kialegee Tribal Town does not have jurisdiction, nor does it exercise governmental power, over the Broken Arrow Property.

45. Operation of a casino on the Broken Arrow Property would exceed the Tribal Town's powers under federal law and violate federal law requirements because the

operation of a Class III casino on the Broken Arrow Property will violate the federally approved Kialegee-State Gaming Compact, which expressly limits the Tribal Town to conducting gaming "only on its Indian lands as defined by IGRA."   Kialegee-State Gaming Compact, Part 5(L).   Oklahoma has a substantial likelihood of success on the merits of its claims in this action because the Red Clay Casino is not on Indian land over which the Tribal Town has jurisdiction and/or over which the Tribal Town exercises governmental power.

### 2.  Likelihood of Irreparable Harm

46. The State has a substantial interest in adjudicating and enforcing the Kialegee State Gaming Compact and IGRA prior to the violation of those laws and to prevent such violation. *See Kansas*, 249 F.3d at 1227-28; *New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1, 5 (E.D.N.Y. 2003).

47. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property, the State will suffer irreparable injury for which there is no plain, speedy, and adequate remedy at law.

48. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property, the State's interest in effectuating and ensuring compliance with the terms of the Kialegee-State Gaming Compact will necessarily be adversely affected.

49. Unless a preliminary injunction is issued enjoining the continued construction and subsequent operation of the proposed Red Clay Casino on the Broken Arrow Property, other Oklahoma tribes that have invested in gaming facility operations in reliance upon

and in compliance with IGRA and a valid State gaming Compact will be adversely affected.

### 3.  Balancing of the Harms

50.    The threatened injury to the State outweighs the harm that a preliminary injunction may cause the defendants.   The defendants will not be prejudiced by an injunction restraining them from proceeding with the construction or operation of the proposed Red Clay Casino because the Tribal Town cannot demonstrate it has or will secure authorization to conduct or license gaming on that site.  *See Kansas,* 249 F.3d at 1228 (threatened injury to State outweighed harm to defendants because Tribe would be entitled to proceed with construction and gaming only if tract qualified as "Indian lands" under IGRA).

51.  To the extent defendants are harmed by a delay in receiving revenues and/or a loss in revenues, such harm is compensable through monetary damages.  *Shinecock Indian Nation,* 280 F. Supp. 2d at 9.

52.  Because defendants commenced construction without exercising reasonable due diligence, and without obtaining necessary governmental approvals, they are largely responsible for their own harm, and their costs were "self-inflicted."  *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).  Consequently, the adverse effects of an injunction preventing operation of a casino in violation of the Kialegee-State Gaming Compact and of IGRA are entitled to little, if any, weight.

### 4.  The Public Interest

53.   The public interest favors enforcing the statutory and regulatory framework provided by IGRA and the Kialegee-State Gaming Compact and fully litigating the

legality of the Tribal Town's operation of a gaming facility on the Broken Arrow Property before gaming may commence. *See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 760 (8th Cir. 2003).

54.   Ample alternative venues are available to the gaming public in the Tulsa area until such time as the legal issues here are finally resolved. *See* Finding of Fact #74, above.

54.   The defendants' on-going actions to construct and place in operation the proposed casino on the Broken Arrow Property violate the federally enforceable Kialegee-State Gaming Compact and federal law.

### D.  Bond

55.   Rule 65(c) requires the party seeking a preliminary injunction to give security "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Under this rule the trial judge has wide discretion in the manner of requiring security." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964).   If damages are ultimately awarded against the State, it does not pose a collection risk. *See Radio One, Inc. v. Wooten,* 452 F. Supp. 2d 754, 760 (E.D. Mich. 2006).   Therefore, the court will not require the State to post bond.

### E.  Scope of the Injunction

56.   Operation of a gaming facility on the Broken Arrow Property must be enjoined because, as set forth above, such operation would clearly be in violation of IGRA and the Kialegee-State Gaming Compact.   In the addition, the defendants admit the building being built "is designed to be a sports bar and a casino."   Because the building is

designed to be a casino, and because the Tribal Town has no jurisdiction over the Broken Arrow Property, construction is enjoined.  However, the court will entertain a motion to modify the injunction if defendants wish to alter the purpose of the structure and have obtained the necessary regulatory approvals from the BIA and/or the Muskogee (Creek) Nation for the alternative proposed use or uses.

### III.  Conclusion

Defendants' efforts to construct and operate a gaming facility on the Broken Arrow Property violate IGRA and—as to Class III gaming—the  Kialegee-State Gaming Compact.  Therefore, defendants, and all those acting by, through, for, or under them, are preliminarily enjoined from:

1.  proceeding with development or construction of the proposed Red Clay Casino or any other gaming facility on the Broken Arrow Property;

2.  conducting Class III gaming on the Broken Arrow Property.


This order shall remain in effect during the pendency of this action unless modified by this Court.

ENTERED this 20th day of July, 2012.


GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA